**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**J.R. HURD; SARA SMITH HURD;**                          **PLAINTIFFS**
**PATRICIA HURD MCGREGOR;**
**VICTORIA HURD GOEBEL; DAVID W.**
**KILLAM; ADRIAN KATHLEEN KILLAM;**
**TRACY LEIGH KILLAM-DILEO; and**
**KILLAM OIL COMPANY, LTD.**

**v.**                          **Case No. 4:21-CV-01207-LPR**

**FLYWHEEL ENERGY PRODUCTION, LLC**                   **DEFENDANT**

## ORDER CERTIFYING A LEGAL QUESTION
## TO THE ARKANSAS SUPREME COURT

This is an oil-and-gas case involving purported lease breaches and statutory violations by Defendant Flywheel Energy Production, LLC.  Plaintiffs are owners of land in Arkansas who entered into mineral-rights leases with Flywheel and other energy companies.  Generally, Plaintiffs allege that Flywheel—the entity responsible for making certain payments under all of the leases at issue—systematically underpays what it owes.

Before me are dueling Motions for Partial Summary Judgment.  Resolving those Motions requires close interpretation of Arkansas's royalty-payment statute, Arkansas Code Annotated section 15-72-305.  It also requires determining the scope and effect of that statute—specifically, the relationship between the statute and certain provisions of Plaintiffs' oil-and-gas leases.  These questions of state law are novel, significant, subject to reasonable dispute, and dispositive of the pending Motions for Partial Summary Judgment.  They directly implicate the detailed regulatory scheme created by the Arkansas General Assembly and put into effect by the Arkansas Oil and Gas Commission.  And they will have significant and long-lasting ramifications for parties to oil-and-gas leases throughout Arkansas.

In such circumstances, principles of comity and federalism strongly suggest certification of the dispositive state law question(s) here.  Both sides agree that certification is appropriate. Indeed, this is the second time in this case that they have jointly requested it.  And, unlike their earlier request that I denied as premature, this case is now at a point where the disputed legal question(s) must be answered.[1]

## FACTUAL AND LEGAL BACKGROUND

As noted above, Plaintiffs are owners of land in Arkansas who entered into leases with Flywheel and other energy companies.[2]  The basic exchange at the heart of each lease was straightforward.  The energy company obtained the right to extract and sell the natural gas beneath that Plaintiff's lands.[3]  And that Plaintiff was entitled to a cut of the money earned selling the gas.[4]

If only things were that simple.  Extracting gas is a heavily regulated endeavor.  There are incredibly complicated and interlocking rules at play.  Thankfully (at least for me), this case only

---

[1] In my September 9, 2022 Order, I explained that "[t]he reason for the denial of the certified-question request [was] not substantive," and that I could "easily imagine certifying this question to the Arkansas Supreme Court at some point in this litigation."  Order (Doc. 19) at 3.  Nevertheless, I denied the certification request because there was "no pending dispositive motion whose outcome would (or might) be dictated by the Arkansas Supreme Court's answer to the certified question."  *Id.*  As I said then:

> A federal trial court should not make demands—even demands that can be refused—on the highest court of a state unless it is absolutely necessary to do so.  If there is a way to resolve a federal case without deciding a question that requires certification, such an approach should generally be taken. But the determination of whether a case can be resolved without deciding a question that requires certification is hard to make in a vacuum.  It often depends on how the case develops during discovery and what arguments the parties make in a summary judgment motion (or other dispositive motion).  In the instant litigation, the Court thinks it is likely that it will have to certify a question to the Arkansas Supreme Court.  But "thinking it is likely" is not the same as being certain it is necessary.  That judgment call must await the parties' dispositive motions briefing.

*Id.* at 3–4.  Now that such dispositive motions have been filed and briefed, it is clear that resolution of the state law question(s) that call for certification cannot be avoided.

[2] *See* Joint Stipulation of Facts (Doc. 28) ¶¶ 1, 3; Ex. 1 (Exemplar Lease) to Second Am. Compl. (Doc. 25) at 1–3. Plaintiffs' leases with Flywheel were originally entered into with SEECO, Inc.  Joint Stipulation of Facts (Doc. 28) ¶ 1.  SEECO later became SWN Production (Arkansas) and then became Flywheel.  *See* Second Am. Compl. (Doc. 25) ¶¶ 8–11; Answer to Second Am. Compl. (Doc. 26) ¶¶ 8–11.

[3] *See* Ex. 1 (Exemplar Lease) to Second Am. Compl. (Doc. 25) at 3.

[4] *See id.* at 4.

requires understanding the basics.  The Arkansas Oil and Gas Commission decides where natural gas wells can be drilled, and creates drilling units for that purpose.[5]  When a drilling unit comprises multiple tracts of land owned by different landowners who have entered into oil-and-gas leases with different energy companies, the relevant lands and mineral interests are "integrate[d]" for purposes of developing and operating that drilling unit.[6]  The integration process essentially requires all the different energy companies in a drilling unit to work together to extract gas from the lands in the unit.  Upon integration, one of the energy-company lessees (i.e., "working interest owners") is designated as the "operator" of the well.[7]  An operator does the "dirty work" of drilling and extracting the gas.[8]  The gas is divvied up among all the working interest owners, who then sell the gas.[9]  Here, Plaintiffs' lands are part of integrated drilling units.  Flywheel is the operator of each of those integrated drilling units.[10]

Even this scheme is simple enough—until it comes time to pay royalties.  There are two important pieces of the royalty-payment puzzle.  First, there is the lease between a landowner and an energy company.  In the case at bar, the leases entitle each Plaintiff to 22.5% of the energy-company lessee's "gross proceeds" received from the sale of gas extracted from beneath that Plaintiff's land.[11]  Importantly, the "gross proceeds" nature of Plaintiffs' leases means that

---

[5] *See* Ark. Code Ann. § 15-72-302(b).

[6] *Id.* § 15-72-303.

[7] *See id.* §§ 15-72-304(b)(2), 305(a)(3)(A)(i).

[8] *See id.* § 15-72-304(b)(2).

[9] *See id.* §§ 15-72-302(d)(1), 304(a), 305(a)(2).

[10] Joint Stipulation of Facts (Doc. 28) ¶¶ 1–3.

[11] *See* Ex. 1 (Exemplar Lease) to Second Am. Compl. (Doc. 25) at 4.  The exact percentage varies from lease to lease. Joint Stipulation of Facts (Doc. 28) ¶ 8.  For the sake of simplicity, I use 22.5% because that is the rate set forth in the Exemplar Lease relied upon by the parties.  *Id.*

(according to the lease) each Plaintiff gets a share of the revenue before the energy company accounts for expenses.[12]

Second, there is Arkansas Code Annotated section 15-72-305(a)(3), which provides:

> One-eighth (⅛) of all gas sold . . . from [a drilling unit] shall be considered royalty gas, and the net proceeds received from the sale thereof shall be distributed to the owners of the marketable title in and to the leasehold royalty . . . .

The heart of the legal dispute in this case is the apparent conflict between (1) the leases' absolute prohibition of deductions prior to the calculation and payment of royalties (i.e., gross proceeds) and (2) the statute's supposed allowance of such deductions (i.e., net proceeds).

Before directly addressing this apparent conflict, it's worthwhile to provide a little statutory history. For a long time, a landowner's lease with an energy company was the only thing that mattered when calculating a royalty payment. So the landowner-lessor's royalty payment was tied directly to that specific energy-company lessee's sales. That setup eventually proved undesirable to landowners in integrated drilling units. Landowners with similar acreages were receiving significantly different royalty checks because some landowners' energy-company lessees were doing a better job (selling for a higher price) at market.[13] In 1985, in an effort to remedy this perceived injustice, the Arkansas General Assembly passed section 15-72-305(a)(3).[14] Section 15-72-305(a)(3) untethers at least a part of a landowner's royalty payment from the financial fortunes of the particular energy company with which that landowner entered into a lease. It does this by giving every landowner in the drilling unit a portion of the revenue earned by every energy

---

[12] Joint Stipulation of Facts (Doc. 28) ¶¶ 6–7.

[13] *See* Thomas F. Meeks, Note, *Perry v. Nicor Exploration, Inc.: Split Stream Sales and Paying Quantities*, 42 Ark. L. Rev. 155, 158 (1989); Ex. 3 (Oil and Gas Comm'n June 23, 2020 Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 29–31, 36–37.

[14] *See* Ex. 3 (Oil and Gas Comm'n June 23, 2020 Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 29–31, 36–37; Ark. Stat. Ann. § 53-115, Preamble Note (1985 Suppl.).

company that sold gas extracted from that drilling unit.  (Throughout this Order, I refer to this as the "blended royalty.")

The General Assembly created a three-step process that puts the blended-royalty scheme into effect. An explanation of this three-step process is helpful in order to understand exactly why Plaintiffs believe Flywheel is acting unlawfully.  Throughout this three-step process, Flywheel wears two hats: one as a working interest owner who sells gas and contributes funds to the blended-royalty pool; the other as the drilling unit operator who is charged with administering the collection and distribution of the blended royalty.

Step One of the blended-royalty process is basically just creating a database.  Each working interest owner must provide the operator with (1) "[t]he names and addresses of all [landowners] under the working interest owner's leasehold interests," (2) each landowner's tax information, and (3) each landowner's proportional share of ownership in the lands constituting the drilling unit.[15] The operator keeps this information on file and, absent any updates from the working interest owner, uses it to distribute blended-royalty payments each month.[16]

Step Two is pooling the "net proceeds" that will ultimately fund the blended royalty.  After selling its share of the gas, each working interest owner, including Flywheel, "remit[s] or cause[s] to be remitted to the operator one-eighth (⅛) of the revenue realized or royalty moneys from gas sales computed at the mouth of the well, less all lawful deductions, including, but not limited to, all federal and state taxes levied upon the production or proceeds . . . ."[17]  Flywheel has interpreted the phrase "gas sales computed at the mouth of the well" as allowing for the deduction of "post-

---

[15] Ark. Code Ann. § 15-72-305(a)(3)(A)(i).

[16] *See id.* § 15-72-305(a)(3)(A)(ii).

[17] *Id.* § 15-72-305(a)(3)(B)(i).

production expenses," namely "compression, gathering, and treatment costs . . . ."[18]  In accordance with that interpretation, Flywheel deducts such costs from its revenue before contributing to the blended-royalty pool.[19]  It appears that other energy companies in the relevant drilling units followed suit and began taking similar deductions too.[20]

Step Three is distribution of the blended royalty.  The operator takes the pooled funds and "distribute[s] the moneys . . . to all" landowners in the drilling unit proportionally to each landowner's share of ownership in the lands constituting the drilling unit.[21]  Along with the distributed moneys, the operator must give the landowner documentation providing, among other things, "[a]ny and all deductions" from that landowner's blended-royalty payment.[22]

The fight between the parties in this case concerns Steps Two and Three.  Essentially, the primary theory of liability is that section 15-72-305's blended-royalty scheme somehow incorporates the terms of landowners' leases in integrated drilling units.  Under this theory, the statute requires a blended-royalty payment that comports with the terms of a lease.  Because the terms of the leases in this case prohibit deductions, Plaintiffs believe the statute requires their blended-royalty payment to be deduction-free.

Plaintiffs have some back-up arguments too.  First, Plaintiffs say that even if they are wrong that section 15-72-305 requires the blended-royalty payment itself to be deduction-free, an energy-company lessee still must ensure that a landowner ultimately gets the full royalty to which he or

---

[18] See Ex. 3 (Oil and Gas Comm'n June 23, 2020 Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 25–28; Br. in Supp. of Def.'s Mot. for Partial Summ. J. (Doc. 33) at 8–9; Joint Stipulation of Facts (Doc. 28) ¶ 10.

[19] See Ex. 1 (Royalty-Payment Process) to Def.'s Resp. to Pls.' Mot. for Partial Summ. J. (Doc. 36-1).

[20] See Br. in Supp. of Pls.' Mot. for Partial Summ. J. (Doc. 31) at 12 ("Flywheel also passed on deductions for post-production expenses from Plaintiffs' royalty payments on wells operated by Flywheel and producing from lands covered by leases with lessees other than Flywheel that are in substantially identical form to the Leases with Flywheel.").

[21] See Ark. Code Ann. § 15-72-305(a)(5)(A).

[22] Id. § 15-72-305(a)(5)(A)(vii).

she is entitled under the lease.  So, where a lease calls for a deduction-free, gross-proceeds payment—and that payment would be greater than a statutorily created net-proceeds payment—the energy company must make up the difference afterwards.  Second, Plaintiffs argue that even if they are forced to live with (both statutorily and contractually) some deductions as a result of the blended-royalty scheme, the post-production-expense deductions at issue in this case are not appropriate under section 15-72-305.  According to Plaintiffs, the type of deductions the energy companies are taking are not the type authorized by section 15-72-305.

Flywheel, on the other hand, believes section 15-72-305—and its net-proceeds language—overrides or replaces (for various legal reasons adverted to below) any conflicting lease provision, including the provisions providing for gross-proceeds royalty calculations.  Flywheel says it is complying with section 15-72-305 (paying out the blended royalty based on net proceeds) and that such compliance nullifies all of Plaintiffs' arguments.  To be clear, however, Flywheel acknowledges that section 15-72-305 concerns only the first ⅛ (or 12.5%) of Plaintiffs' lease-based royalty interests.  Anything above that threshold share promised to Plaintiffs in a lease is governed solely by that lease.  For example, in the leases in this case, Plaintiffs are entitled to a 22.5% royalty payment.  Both parties agree that, after the 12.5% threshold, the remaining payments by energy-company lessees to Plaintiffs must be based off of gross proceeds.  Flywheel's net-proceeds argument—and the legal dispute in this case—solely concerns the first ⅛, or 12.5% royalty payment.[23]

---

[23] *See* Joint Stipulation of Facts (Doc. 28) ¶ 11; Def.'s Resp. to Pls.' Mot. for Partial Summ. J. (Doc. 36) at 6.

## DISCUSSION OF LEGAL ISSUES

At a 30,000 foot level, one could cobble together a unified certified question.  To be fair, it's a little bit of a bear:

> Does Arkansas Code Annotated section 15-72-305 allow the deduction of post-production expenses from proceeds earned by the sale of "royalty gas," as that term is used in section 15-72-305(a)(3), notwithstanding the fact that a recipient of the resulting royalty payment has entered into an oil-and-gas lease that would disallow such deductions if said royalty payment had arisen directly from that oil-and-gas lease?

In my view, there is a good way to simplify things.  The certified question is best considered in two parts.  First, does the blended-royalty scheme in section 15-72-305 override, replace, or alter the terms of Plaintiffs' leases with respect to the first 12.5% of any royalty created under those leases?  If the answer to that question is "no," then Plaintiffs have established liability and the case would return to me for the limited purpose of calculating damages.  But if the answer to the first question is "yes," then it must be determined whether the post-production-expense deductions at issue in this case are the type of deductions allowed under section 15-72-305.  If they are, then Flywheel is not liable to Plaintiffs at all.  If they are not, then this case will proceed to the damages phase.

If left to my own devices to guess at how you would resolve these issues, my conclusions would be: (1) section 15-72-305 does effectively supplant Plaintiffs' leases, at least in part; and (2) the post-production-expense deductions at issue in this case are appropriate under the statute.  But there is no Arkansas Supreme Court case that definitively answers these questions, or even one that gives me a good basis to make an educated guess as to how you would resolve the matter.  Given the stakes of this litigation—not only for the parties to this individual case, but for Arkansas landowners, energy companies, and regulatory agencies—you should have the right of first refusal on answering these questions.

I provide my initial take below.  But I want to stress that I am only providing this analysis as a way to frame the issue(s) that call for your consideration.  It matters very little what I think state law means and requires here.  What really matters is what you—the highest court in Arkansas—think state law means and requires.

## I.   Applicability of Plaintiffs' Leases

In my view, the text of section 15-72-305 suggests that the blended royalty is a creature of statute unaffected by the terms of any particular private lease.  For starters, a person's entitlement to the blended royalty is not dependent upon the existence of a private lease.  If someone owns land in a drilling unit but hasn't entered into an oil-and-gas lease, that landowner is treated the same as someone with a lease-based royalty interest.[24]  More importantly, it appears from the text that the General Assembly actually intended to override and replace lease terms to the extent those terms overlap with the blended-royalty scheme.  In section 15-72-305(a)(6)(A), the General Assembly relieved working interest owners from "all obligations . . . with respect to the payment of one-eighth leasehold royalty" upon a landowner's receipt of the blended royalty.  So if a landowner has a 12.5% lease-based royalty interest with a working interest owner, that working interest owner doesn't have to cut a check because the landowner is considered fully paid by the blended royalty.  If the landowner's lease creates a royalty greater than 12.5%, however, the landowner and working interest owner must hash out the "excess" royalty amongst themselves as a matter of contract performance.[25]

---

[24] *See* Ark. Code Ann. §§ 15-72-304(d), 305(a)(3).  When a landowner within a drilling unit has not leased his or her land to an energy company, the statute considers that landowner to be "the owner of a royalty interest to the extent of a one-eighth interest in and to" the subsurface minerals.  *Id.* § 15-72-304(d).  And when the subsurface mineral at issue is gas, the blended royalty "fully discharge[s] all obligations . . . with respect to the payment of" that landowner's royalty interest.  *Id.* § 15-72-305(a)(6)(A) (cross-referencing section 15-72-304(d)).

[25] *See id.* § 15-72-305(a)(8)(C) ("Nothing contained in [section 15-72-305] shall affect the obligations of working interest owners with respect to the payment of royalties . . . in excess of the one-eighth royalty required to be distributed under this section.").

What section 15-72-305 doesn't say is also important.  Recall that working interest owners must provide the operator with certain information so that the operator can perform its role of collecting and distributing the blended royalty.  In deciding what pieces of information were necessary for the operator to receive, the General Assembly did not include information about the terms of the working interest owners' leases with landowners in the drilling unit.  If private lease terms matter for the ⅛ blended-royalty calculation, it is at the very least odd that an operator must affirmatively seek out that information even though the working interest owners are tasked with keeping the operator up to date on all other relevant points.  The omission of lease-specific information further indicates that the terms of a privately entered lease are not relevant to the blended-royalty calculation.

Naturally, Plaintiffs disagree.  They argue that section 15-72-305 expressly requires Flywheel to abide by the terms of their leases.  Specifically, Plaintiffs rely on section 15-72-305(a)(2), which provides:

> For the purpose of making distribution to the owners of royalty . . . or similar interests, there shall be allocated to each tract in the established drilling unit that percentage of the total production from such drilling unit, . . . which the area of each tract bears to the total area of the drilling unit.  *The interests shall be paid or delivered to each owner thereof in conformance with the provisions of the appropriate lease, agreement, or contract creating it*, but computed upon the production allocated to each tract as hereinabove provided, rather than upon the actual production therefrom.

Plaintiffs say that the italicized clause (which of course is not italicized in the statute) requires the blended royalty to be paid in accordance with the terms of their leases.  I do not believe that section 15-72-305(a)(2) smuggles the terms of Plaintiffs' leases into the blended-royalty scheme.  Here's why.

Section 15-72-305(a)(2) has been around in some form or fashion since 1939 and gained its current form in 1963—well before section 15-72-305(a)(3)'s 1985 enactment.[26]  That's the first clue that the italicized language in section 15-72-305(a)(2) is not particularly useful in determining the meaning of section 15-72-305(a)(3) and subsequent provisions.  Indeed, section 15-72-305(a)(2) seems to speak to a completely different issue than the gross proceeds-vs.-net proceeds problem, which is unsurprising because there was no such issue when section 15-72-305(a)(2) was enacted.

The problem section 15-72-305(a)(2) appears intended to address is as follows.  A landowner can only lease to an energy company the specific land he or she owns, which would mean that the lease and any accompanying royalty payment would necessarily relate to gas the energy company was able to extract from that specific land.  Integration, however, changes things.  That's because the well that extracts the gas might not be on that parcel of land, but rather on someone else's parcel in the drilling unit.  Accordingly, to work around this problem, section 15-72-305(a)(2) uses proportional acreage as a proxy for how much gas each parcel of land in the drilling unit actually produced.  The italicized portion of section 15-72-305(a)(2) is simply explaining that the calculation of royalty payments must be based on this fiction regardless of what a lease says.  It is true that the language means the statutorily created fiction just discussed does not otherwise alter aspects of the lease.  But that language does not preclude later-enacted provisions of section 15-72-305 (such as section 15-72-305(a)(3)) from creating new integration-based rules and then further tweaking the provisions of a lease to account for those rules.  Put

---

[26] *See* Arkansas Act 105 of 1939, § 15; Ark. Stat. Ann. § 53-115, Amendments Note (Supp. 1969) (detailing "the 1963 amendment [to] subsection A . . .").

differently, the language in section 15-72-305(a)(2) is specific to section 15-72-305(a)(2) and does not control section 15-72-305(a)(3).

There are other clues that section 15-72-305(a)(2) does not control here. First, by its own terms, section 15-72-305(a)(2) is concerned with royalty interests that are "create[d]" by a "lease, agreement, or contract . . . ." But the blended royalty does not arise from any private agreement. To the contrary, section 15-72-305 considers the blended royalty as *replacing* lease-based royalty interests. Second, section 15-72-305(a)(2) applies to any production of a drilling unit (e.g., oil or gas), while the blended-royalty scheme applies only to gas and arose as a specific fix to the unliked consequences of purely lease-based royalties in Arkansas's gas market.[27]

Third, Plaintiffs' position would require the introduction of complex, atextual steps to the blended-royalty scheme. The General Assembly gave drilling unit operators a relatively simple job—take a pot of money and dole it out to royalty owners in proportion to their interest in the lands constituting the drilling unit. Plaintiffs would require much more. Under Plaintiffs' view, operators would have to proactively obtain every relevant lease and familiarize themselves with the terms of each lease. And paying out the blended royalties in accordance with those leases looks to be a rather daunting task. Both section 15-72-305 and the record in the case before me indicate that working interest owners take deductions *before* contributing to the blended-royalty pot.[28] If Plaintiffs' resulting payments must be deduction free, then the blended-royalty pot would not have sufficient funds. So it seems that Plaintiffs would require an operator to make up the difference itself and then seek reimbursement from the working interest owner who took deductions. It is true that an operator is entitled to seek reimbursement from the other working

---

[27] *See supra* pp. 4–5.

[28] *See* Ark. Code Ann. § 15-72-305(a)(3)(B)(i); Ex. 1 (Royalty-Payment Process) to Def.'s Resp. to Pls.' Mot. for Partial Summ. J. (Doc. 36-1).

interest owners for "the reasonable cost[s] of administering" the blended-royalty scheme.[29]  But one must employ a fairly broad conception of "administration" to characterize supplementing another working interest owner's contributions as an administrative cost.  If the General Assembly intended to create such burdens for operators, it's fair to expect that it would have done so more clearly.

Plaintiffs' backup argument—that Flywheel (as lessee, not as operator) must repay Plaintiffs (as "gross proceeds" lessors) for any deductions taken at Step Two of the blended-royalty process—is similarly difficult to reconcile with the statutory text.  Two provisions of section 15-72-305 are relevant on this point.  First, there is section 15-72-305(a)(6)(A), which states:

> Payment of one-eighth (⅛) of the revenue realized from the sale of gas as provided in this section shall fully discharge all obligations of the operator and other working interest owners with respect to the payment of one-eighth leasehold royalty . . . .

Second, there is section 15-72-305(a)(8)(C), which states:

> Nothing contained in this section shall affect the obligations of working interest owners with respect to the payment of royalties . . . in excess of the one-eighth royalty required to be distributed under this section.

Plaintiffs read these provisions as saying that the amount of the blended-royalty payment can be credited against the working interest owner's lease-based royalty obligations, but that the working interest owner must still make sure the landowner receives the full amount due under the relevant lease. This full amount, according to Plaintiffs, would include the delta between the ⅛ blended royalty (which took account of post-production-expense deductions) and what that ⅛ blended royalty would have been if calculated according to the terms of the lease (that is, without almost all of those deductions).

---

[29] Ark. Code Ann. § 15-72-305(a)(7)(A).

Plaintiffs are overreading section 15-72-305(a)(8)(C) and underreading (indeed, basically ignoring) section 15-72-305(a)(6)(A). A simple hypothetical can help illuminate the flaw in Plaintiffs' analysis of the statutory provisions. Imagine an integrated drilling unit that has two landowners—Landowner A and Landowner B—each with 50% of the acreage in the unit. Landowner A has a ⅛ net-proceeds royalty lease with Company 1; Landowner B has a ⅛ net-proceeds royalty lease with Company 2. Last month, Company 1 was the only company to sell gas, and Company 1's statute-based blended-royalty contribution for the month (i.e., ⅛ of the net-proceeds of its sales) comes out to $100. That means Landowner A and Landowner B each receive a $50 blended-royalty check—because they each own 50% of the land in the drilling unit and thus split evenly the blended-royalty pool of $100.

On my read of the statute, both Company 1 and Company 2 have no additional royalty obligations for that month. Put another way, satisfying the statutory ⅛ obligation stands in completely for satisfying the leases' ⅛ obligation. But, on Plaintiffs' theory, Company 1 still owes Landowner A an additional $50 because, under the lease, Landowner A is entitled to ⅛ of Company 1's net proceeds (which amounted to $100). That theory not only nullifies the portion of section 15-72-305(a)(6)(A) that "discharge[s] all" of a working interest owner's "obligations . . . with respect to the payment of one-eighth leasehold royalty," it directly contradicts it by actually *increasing* working interest owners' total liabilities: In a lease-only world, Company 1 would only have to pay out a total of $100, all to Landowner A; but Plaintiffs' theory would require Company 1 to pay a total of $150, with $100 going to Landowner A and $50 going to Landowner B.

In my view, the only way to give both section 15-72-305(a)(6)(A) and section 15-72-305(a)(8)(C) effect is to recognize that the General Assembly used something between a sledgehammer and a scalpel when it wrote the provisions regarding the blended royalty. The

14

General Assembly substituted the blended-royalty payment for any ⅛ royalty interest created by a lease—even if the blended-royalty process treats the landowner less favorably than the lease would have.  If a lease creates only a ⅛ royalty interest, then the blended-royalty payment completely satisfies the energy-company lessee's obligations.  If the lease creates a royalty interest above ⅛, such as Plaintiffs' 22.5% royalty interests, then the blended-royalty payment satisfies the energy-company lessee's obligations as to the "first" 12.5%, with the remaining 10% being governed by the lease.

Make no mistake, my interpretation means that the General Assembly has created a system in which private leases are effectively rewritten immediately upon integration.  But your Court has held that, as a matter of state law, the General Assembly has the power to alter the terms of oil-and-gas leases swept up in integrated drilling units.[30]  I would simply conclude that the blended-royalty scheme is an exercise of that recognized power.

In light of the foregoing, it is obvious that I believe a four-corners reading of section 15-72-305 strongly favors Flywheel's position.  I wish to emphasize once again, however, that this case presents complex subject matter and difficult questions of statutory interpretation.  So I would not be the least bit surprised if you concluded that I got something wrong along the way.  And there is at least one compelling reason for you to give Plaintiffs' theory a closer look: My interpretation of the statute would trigger constitutional challenges that are currently lying dormant in Plaintiffs' operative Complaint.[31]  To be clear, Plaintiffs' constitutional claims are not currently

---

[30] *Hurd v. Ark. Oil & Gas Comm'n*, 2020 Ark. 210, 601 S.W.3d 100.

[31] Specifically, Plaintiffs' constitutional claims are as follows:

> [I]f Ark. Code Ann. § 15-72-305 requires or allows Flywheel to deduct expenses from gas royalties payable under the Leases (or payable by Flywheel as operator under leases in substantially the form of the Leases but with other lessees), then Plaintiffs seek a declaration that Ark. Code Ann. § 15-72-305 violates the Fifth and Fourteenth Amendments to the United States Constitution, and Article 2, Section 22 of the Arkansas Constitution, in that it effects a taking of Plaintiffs' property without

before me.  Those claims are lodged in Count III of the Second Amended Complaint, and the cross Motions for Partial Summary Judgment relate solely to Plaintiffs' breach-of-contract and statutory claims lodged in Counts I and II of the Second Amended Complaint, respectively.[32]  Accordingly, the issues before me (and by extension the certified question) turn entirely on the interpretation of section 15-72-305.  And because I do not consider section 15-72-305's blended-royalty scheme to be ambiguous,[33] the specter of the statute's possible unconstitutionality did not factor into my analysis.[34]

## II.    Deduction of Post-Production Expenses

If the terms of private leases don't apply to the ⅛ blended-royalty process, then it must also be determined whether section 15-72-305 allows for post-production expenses to be deducted from a working interest owner's contribution to the blended-royalty pool.  I would conclude that it does. But, as with the first part of the certified question, reasonable minds could differ.  Additionally, the post-production-expenses issue may turn on one's reading of your prior cases.  And those prior cases are not so on-point that they give a ready answer.  So, for all the comity and federalism reasons I have already noted above, you should have the right of first refusal on answering this question.

---

just compensation, and that it violates Article I, Section 10 of the United States Constitution, and Article 2, Section 17 of the Arkansas Constitution, in that it impairs the obligations of contracts.

Second Am. Compl. (Doc. 25) ¶ 41.

[32] *Id.* ¶¶ 25–37; Pls.' Mot. for Partial Summ. J. (Doc. 29) at 1; Def.'s Mot. for Partial Summ. J. (Doc. 32) at 1.

[33] One might see some tension between my conclusion that Arkansas Code Annotated section 15-72-305 is unambiguous and my acknowledgement that you all might reach a different position on either the statute's meaning or its scope.  There are often times where parties or jurists will reach different conclusions about a statute's meaning but each believes the statute unambiguously supports their interpretation.  The mere fact that such disagreement exists does not automatically mean a statute is ambiguous.  I believe the statute is unambiguous, and this belief is not lessened by an acknowledgement that other jurists might see things differently—either because of the statute's language itself or because other interpretive methods might lead to different results.

[34] *See McFadden v. United States*, 576 U.S. 186, 197 (2015).

The blended royalty is "the net proceeds received from the sale" of "[o]ne-eighth (⅛) of all gas" extracted from a drilling unit.[35]  By using "net proceeds" instead of "gross proceeds" or simply just "proceeds," the General Assembly clearly approved of deductions in some form or fashion.[36]  This approval is further evidenced by the provision that outlines how a working interest owner calculates its contribution to the blended-royalty pool.  There, the General Assembly said that a working interest owner's contribution equals ⅛ of revenue "from gas sales computed at the mouth of the well" minus "all lawful deductions, including, but not limited to, all federal and state taxes levied upon the production or proceeds . . . ."[37]  In my opinion, and as set forth in the following paragraphs, the General Assembly's decision to have working interest owners calculate their revenue based on "gas sales computed at the mouth of the well" renders lawful the deduction of the types of post-production expenses at issue in the instant case.

The phrase "at the mouth of the well" carries a specific, well-understood meaning within the oil-and-gas industry.[38]  Essentially, "at the mouth of the well" or "at the well" is shorthand for gas's value in its raw, unimproved state.[39]  It is largely a fictional value.  In order to be marketable, gas often must undergo some degree of processing (e.g., compression).[40]  When included in mineral leases like the ones in this case, the phrase is used to allocate the costs of such processing.[41]  More specifically, it means that an energy-company lessee can subtract the processing costs from the ultimate sale price.  The resulting number, meant to be a fair approximation of the gas's value

---

[35] Ark. Code Ann. § 15-72-305(a)(3).

[36] *Cf. Hanna Oil & Gas Co. v. Taylor*, 297 Ark. 80, 81 759 S.W.2d 563, 564–65 (1988).

[37] Ark. Code Ann. § 15-72-305(a)(3)(B)(i).

[38] *See* Randy Sutton, Annotation, *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs*, 99 A.L.R. 5th 415 (2002).

[39] *Id.*

[40] *Id.*

[41] *Id.* ("Most cases . . . allocat[e] postproduction costs to the lessor and lessee, proportionately.").

"at the mouth of the well," becomes the basis for calculating the landowner-lessor's royalty.  This method of allocating post-production costs was a fairly standard industry practice in 1985 when the General Assembly crafted the blended-royalty scheme.[42]

Prior decisions from your Court show that, by 1985, Arkansans understood the phrase's effect on royalty calculation.  In *Clear Creek Oil & Gas Company v. Bushmiaer*, the landowner-lessor was entitled to "one-eight[h] of all gas marketed from such wells," with the basis of the royalty being "the market price of royalty gas at the well . . . ."[43]  The energy-company lessee received "10 cents per 1,000 cubic feet for gas," but incurred "3 ½ cents per 1,000 cubic feet to transport and distribute the gas."[44]  You held that the landowner-lessor's royalty should be calculated on a "6 ½ cents per 1,000 cubic feet" basis because that represented "the market price of the gas" under the lease.[45]  In *Parnell, Inc. v. Giller*—another case in which the lessor's royalty was pegged to the price of the commodity "at the well"—you reaffirmed *Clear Creek* and held that post-production expenses are deductible when they arise from "services that are essential to and peculiar to the marketing of the product itself."[46]  Given this well-understood meaning and effect of the phrase at the time of enactment, I would hold that section 15-72-305(a)(3)(B)(i) allows working interest owners to deduct post-production expenses such as "compression, gathering, and treatment costs" from sales revenues before contributing to the blended-royalty pool.[47]

---

[42] *See* Susan Webber Wright, *The Arkansas Law of Oil and Gas: Chapter IV*, 10 U. Ark. Little Rock L. Rev. 5, 12–13 (1987) ("Although the expenses of production are not deductible, other expenses, such as transportation and treatment expenses, generally may be deducted from the royalty owner's share." (citing H. Williams & C. Myers, Manual of Oil and Gas Terms 770 (6th ed. 1984)).

[43] 165 Ark. 303, 264 S.W. 830, 831 (1924).

[44] *Id.*, 264 S.W. at 831.

[45] *Id.*, 264 S.W. at 832.

[46] 237 Ark. 267, 372 S.W.2d 627, 628 (1963).

[47] Joint Stipulation of Facts (Doc. 28) ¶ 10.

Plaintiffs contend that intervening precedent from your Court has rejected the foregoing interpretation of "at the mouth of the well."  Specifically, Plaintiffs cite your 1988 decision in *Hanna Oil & Gas Company v. Taylor*.[48]  There, the lease provided that the landowner-lessor was entitled to "one-eighth of the proceeds received by" the energy-company lessee "at the well . . . ."[49]  For the first eight years of the lease, the energy company had little to no processing expenses, so no deductions were made.[50]  Then, after eight years, the energy company began to incur processing expenses, specifically the costs associated with compressing the gas for transportation.[51]  Yet, for two years after such costs became an issue, the energy company continued not taking any deductions from the landowner's royalty payments.[52]  Only after those two years of absorbing the compression costs did the energy company finally begin deducting such costs from the landowner's royalty.[53]  A majority of the Arkansas Supreme Court held that the deductions were unlawful.[54]  To Plaintiffs, *Hanna* means that "at the mouth of the well" in section 15-72-305(a)(3)(B)(i) doesn't authorize the deduction of post-production expenses.

In my view, the *Hanna* decision can't bear the weight that Plaintiffs place on it.  *Hanna* is at most persuasive authority because it in no way arose from or implicated section 15-72-305.  And *Hanna* cannot even be said to be persuasive as to the meaning of "at the mouth of the well," specifically.  While the lease at issue in *Hanna* did contain the "at the well" terminology, the majority didn't address that language.  The majority focused instead on the "proceeds" language,

---

[48] Br. in Supp. of Pls.' Mot. for Partial Summ. J. (Doc. 31) at 23–24.

[49] *Hanna*, 297 Ark. at 81, 759 S.W.2d at 564.

[50] *Id.*, 759 S.W.2d at 564.

[51] *Id.*, 759 S.W.2d at 564.

[52] *Id.*, 759 S.W.2d at 564.

[53] *Id.*, 759 S.W.2d at 564.

[54] *Id.* at 81–82, 759 S.W.2d at 564–65.

reasoning that if the parties wanted to allow deductions, they would have written something like "net proceeds" into the lease.[55]  I agree with Justice Hays's point made in dissent that the majority's failure to grapple with the "at the well" language was a fundamental error in the lease-language analysis.[56]  That is, the majority incorrectly made the final sale price the point of valuation, while the lease specifically pegged the royalty to the gas's value "at the well."  So *Hanna* offers little to nothing with respect to the meaning of "at the mouth of the well" in section 15-72-305(a)(3)(B)(i).

That isn't to say *Hanna* needs to be overruled.  The *Hanna* majority supplied a completely separate and, in its own view, more "compelling" justification for its decision: The parties' course of dealing over the life of the lease showed that they understood their agreement to prohibit post-production-expense deductions.[57]  I would read that fact-specific resolution as *Hanna*'s sole holding and consider its brief lease-language analysis unpersuasive dicta for purposes of interpreting "at the mouth of the well" in section 15-72-305(a)(3)(B)(i).  For purposes of interpreting "at the mouth of the well," I would instead be guided by the more on-point and in-depth analyses of *Clear Creek* and *Parnell*, as well as the historical evidence of generally accepted industry practices at the time of enactment.  (The *Hanna* majority did not even talk about those cases, let alone suggest it was overruling them.)  In any event, even if one thinks that *Hanna*'s lease-language analysis bears on the interpretation of section 15-72-305(a)(3), *Hanna* still cuts against Plaintiffs.  By basing the blended royalty on "net proceeds," the General Assembly did exactly what the *Hanna* majority said to do in order to allow deductions of post-production expenses.[58]

---

[55] *Id.* at 81, 759 S.W.2d at 564–65.

[56] *See id.* at 82–85, 759 S.W.2d at 565–67 (Hays, J., dissenting).

[57] *Id.* at 82, 759 S.W.2d at 565.

[58] *Id.* at 81, 759 S.W.2d at 564–65.

## CERTIFICATION OF LEGAL QUESTION

Arkansas Supreme Court and Court of Appeals Rule 6-8 grants your Court the discretion to "answer questions of law certified to it by order of a federal court of the United States" in circumstances such as are present in this case.[59]  Rule 6-8 requires this certification request to contain: (1) "the question of law to be answered"; (2) "the facts relevant to the question"; (3) this Court's acknowledgement that your Court may reformulate the question of law; and (4) counsel's names and addresses.[60]  That information is set forth below.

1. The question of law to be answered at your discretion is as follows: Does Arkansas Code Annotated section 15-72-305 allow the deduction of post-production expenses from proceeds earned by the sale of "royalty gas," as that term is used in section 15-72-305(a)(3), notwithstanding the fact that a recipient of the resulting royalty payment has entered into an oil-and-gas lease that would disallow such deductions if said royalty payment had arisen directly from that oil-and-gas lease?

2. The relevant facts are set forth above.  The parties have agreed on all facts relevant to the certified question of law.[61]  There are no disputes of fact whatsoever, let alone genuine disputes of fact.

3. I acknowledge that the Arkansas Supreme Court may reformulate the question of law, including breaking it up into multiple questions.

4. The names, addresses, phone numbers, and email addresses for Plaintiffs' counsel are:

---

[59] Ark. R. Sup. Ct. & Ct. App. 6-8(a).

[60] Ark. R. Sup. Ct. & Ct. App. 6-8(c)(1).

[61] *See* Joint Stipulation of Facts (Doc. 28).

     a.   William A. Waddell, Jr., Friday, Eldredge & Clark, LLP, Regions Center, 400 West Capitol Avenue, Suite 2000, Little Rock, AR 72201, (501) 370-1510, waddell@fridayfirm.com.

5.   The names, addresses, phone numbers, and email addresses for Defendant's counsel are:

     a.   G. Alan Perkins, PPGMR Law, PLLC, Post Office Box 3446, Little Rock, AR 72203, (501) 603-9000, alan@ppgmrlaw.com.

     b.   M. Christine Dillard, PPGMR Law, PLLC, Post Office Box 3446, Little Rock, AR 72203, (501) 603-9000, christine@ppgmrlaw.com.

6.   The Court directs the Clerk to immediately send a paper and electronic copy of this Order, along with a paper and electronic copy of the entire record, to the Clerk of the Arkansas Supreme Court.

IT IS SO ORDERED this 26th day of May 2023.


_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE