IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**J.R. HURD; SARA SMITH HURD;**                                         **PLAINTIFFS**
**PATRICIA HURD MCGREGOR;**
**VICTORIA HURD GOEBEL; DAVID W.**
**KILLAM; ADRIAN KATHLEEN KILLAM;**
**TRACY LEIGH KILLAM-DILEO; and**
**KILLAM OIL COMPANY, LTD.**

**v.**                                      **Case No. 4:21-cv-01207-LPR**

**FLYWHEEL ENERGY PRODUCTION, LLC**                              **DEFENDANT**

<u>**ORDER**</u>

This is an oil-and-gas case involving purported lease breaches and statutory violations by Defendant Flywheel Energy Production, LLC.  Plaintiffs are landowners in Arkansas who entered into mineral-rights leases with Flywheel.  Flywheel is both the working interest owner (that is, the mineral-rights lessee) and the operator charged with drilling and extracting natural gas from an integrated drilling unit comprised of multiple mineral-rights leaseholds.

The operative Complaint pled three general buckets of claims: (1) breach of contract claims; (2) statutory failure-to-pay-proceeds claims; and (3) constitutional claims based on the Takings Clause and the Contract Clause of the United States Constitution, as well as comparable provisions of the Arkansas Constitution.[1]  On July 25, 2023, this Court issued an Order concluding that Flywheel was entitled to summary judgment on the first two buckets of claims.[2]  But an actual

---

[1] *See generally* Second Am. Compl. (Doc. 25).

[2] Order Granting Def.'s Mot. for Partial Summ. J. and Den. Pls.' Mot. for Partial Summ. J. (Doc. 51) at 2.  The Court's summary judgment Order relied in large part on a previous Order from the Court certifying a legal question to the Arkansas Supreme Court.  In that Certification Order, the Court explained how it would rule (and why) if the Arkansas Supreme Court denied certification.  *See generally* Order Certifying a Legal Question to the Ark. Sup. Ct. (Doc. 45) ("Certification Order").  Subsequently, the Arkansas Supreme Court did, in fact, deny certification.  *See* Per Curiam Order Den. Req. to Certify Question of Law (Doc. 50).  Accordingly, this Court issued a summary judgment decision confirming what it had already said in the Certification Order.

judgment was not entered because the constitutional claims remained to be litigated—neither party had, at that time, moved for summary judgment on those third-bucket claims.[3]

As litigation of this last bucket was unfolding, the Arkansas Court of Appeals issued an opinion that diverged dramatically from an important part of this Court's July 25, 2023 summary judgment decision.[4]  The Arkansas Court of Appeals' decision was—at least potentially—a major development.  Because the first two buckets of claims in this case involve novel state law issues, what the Arkansas Court of Appeals has to say about those issues is persuasive evidence of how those issues should be resolved under Arkansas law.  And that matters here in federal court because of the demands of *Erie Railroad Co. v. Tompkins* and its progeny.[5]  A federal court sitting in diversity must apply the applicable state substantive law (as opposed to federal law) in resolving state law claims.[6]

Given the foregoing, it should not surprise anyone that Plaintiffs filed a Motion asking the Court to reconsider its previous summary judgment ruling in light of the Arkansas Court of Appeals' new decision.[7]  The Court analyzes that request in this Order.  Following that analysis and a ruling on the reconsideration request, the Court goes on to address Flywheel's pending Motion for Summary Judgment on the constitutional claims.[8]

The facts of this case—and the relationships between landowners, working interest owners, and operators—are complicated.  Fortunately, the Court has already expounded upon them in a

---

[3] *See* Order Granting Def.'s Mot. for Partial Summ. J. and Den. Pls.' Mot. for Partial Summ. J. (Doc. 51) at 2.

[4] *See Flywheel Energy Prod., LLC v. Ark. Oil and Gas Comm'n*, 2023 Ark. App. 483, 678 S.W.3d 851.

[5] 304 U.S. 64 (1938).

[6] *Id.* at 78.

[7] *See* Mot. to Reconsider Partial Summ. J. on Claims Asserted in Counts I and II (Doc. 70).

[8] Def.'s Mot. for Summ. J. (Doc. 61).

previous Order.[9]  The relevant sections of that Order are hereby adopted and incorporated into this Order.[10]  To summarize, Plaintiffs allege that Flywheel—the entity responsible for making royalty payments under all of the leases at issue—has been systematically engaging in unlawful expense deductions that artificially deflate the royalty payments distributed to landowners.  They are incorrect, as explained below.

## I.    This Court's Prior Interpretation of "Net Proceeds"

Whether Flywheel's deductions were lawful turns on the Court's interpretation of Arkansas Code Annotated section 15-72-305, including (but not limited to) the meaning of the term "net proceeds" used in that statutory provision.  Section 15-72-305(a)(3) provides:

> One-eighth (⅛) of all gas sold . . . from [a drilling unit] shall be considered royalty gas, and the net proceeds received from the sale thereof shall be distributed to the owners of the marketable title in and to the leasehold royalty . . . .

From the start of this case, the Court recognized that the interpretation of section 15-72-305, including (but not limited to) the term "net proceeds," presented issues of first impression. Because of the novel, significant, and difficult nature of the state law issues in this case, the Court certified the following question to the Arkansas Supreme Court:

> Does Arkansas Code Annotated section 15-72-305 allow the deduction of post-production expenses from proceeds earned by the sale of "royalty gas," as that term is used in section 15-72-305(a)(3), notwithstanding the fact that a recipient of the resulting royalty payment has entered into an oil-and-gas lease that would disallow such deductions if said royalty payment had arisen directly from that oil-and-gas lease?[11]

The Court's Certification Order did more than just ask this question.  In an attempt to highlight the intricacy of the question, the Court also provided its own analysis of the question.

---

[9] *See* Certification Order (Doc. 45) at 2–7.

[10] *Id.*

[11] *Id.* at 21.

First, the Court concluded that section 15-72-305 creates a mandatory statutory blended royalty that effectively replaces the first 1/8 leasehold royalty.[12]  Second, the Court concluded that section 15-72-305(a)(3) allows for post-production expenses to be deducted from a working interest owner's contribution to the blended-royalty pool.[13]  Since the statutory 1/8 blended royalty replaces the leasehold royalty, and since the statute permits a working interest owner like Flywheel to deduct post-production expenses, the Court concluded that Flywheel's deduction of post-production expenses from the first 1/8 royalty it paid out to Plaintiffs was lawful.[14]

In addition to laying out how the Court would resolve the certified question, the Certification Order also explained that the Court believed that (1) reasonable jurists could disagree on the state law questions at issue, and (2) there was no strong evidence from which to make an educated guess as to how the Arkansas Supreme Court would rule:

> If left to my own devices to guess at how you would resolve these issues, my conclusions would be: (1) section 15-72-305 does effectively supplant Plaintiffs' leases, at least in part; and (2) the post-production-expense deductions at issue in this case are appropriate under the statute.  But there is no Arkansas Supreme Court case that definitively answers these questions, or even one that gives me a good basis to make an educated guess as to how you would resolve the matter.  Given the stakes of this litigation—not only for the parties to this individual case, but for Arkansas landowners, energy companies, and regulatory agencies—you should have the right of first refusal on answering these questions.
>
> I provide my initial take below.  But I want to stress that I am only providing this analysis as a way to frame the issue(s) that call for your consideration.  It matters very little what I think state law means and requires here.  What really matters is what you—the highest court in Arkansas—think state law means and requires.[15]

---

[12] *Id.* at 9.

[13] *Id.* at 16.  In the Court's Certification Order, and in today's Order, the Court refers to various iterations of "deductions of post-production expenses from royalty payments."  That is a shorthand way of referring to a royalty payment calculation method whereby a working interest owner (and/or operator) deducts post-production expenses (like compression and treatment) from its gross revenues before calculating the royalty payment to ultimately be remitted to a landowner.

[14] *Id.* at 17.

[15] *Id.* at 8–9.

The Arkansas Supreme Court declined to address the question.[16]  So, based on the reasoning set out in the Certification Order, this Court granted summary judgment in favor of Flywheel on the first two buckets of claims.[17]  As explained above, however, because of the still-live third bucket of claims, final judgment has not yet been entered.[18]

## II.      The Arkansas Court of Appeals' Interpretation of "Net Proceeds"

About three months after the Court entered its July 2023 summary judgment Order, the Arkansas Court of Appeals issued its decision in *Flywheel Energy Production, LLC v. Arkansas Oil and Gas Commission*.[19]  That decision squarely addressed the lawfulness of Flywheel's deductions of post-production expenses under the "net proceeds" language of section 15-72-305(a)(3).  The Arkansas Court of Appeals concluded that the "net proceeds" language did not authorize Flywheel's deductions beyond taxes, assessments, and true third-party expenses (which the decision appeared to limit to transportation costs).[20]  That conclusion is directly at odds with the July 2023 summary judgment Order issued by this Court.[21]

Although the Arkansas Court of Appeals did not mention—let alone wrestle with—this Court's earlier (and opposite) conclusion, it is necessary for this Court to give serious consideration to the Arkansas Court of Appeals' decision.  That is true for many reasons, most prominently the

---

[16] Per Curiam Order Den. Req. to Certify Question of Law (Doc. 50).

[17] *See* Order Granting Def.'s Mot. for Partial Summ. J. and Den. Pls.' Mot. for Partial Summ. J. (Doc. 51) at 2.

[18] *See id.*

[19] 2023 Ark. App. 483, 678 S.W.3d 851.

[20] *Id.* at 20, 678 S.W.3d at 862.

[21] The conflict between this Court's summary judgment Order and the Arkansas Court of Appeals' decision is limited to the interpretation of "net proceeds" under the statute.  As the parties know, this Court's July 2023 summary judgment Order also concluded that the statutory blended royalty overrides and replaces lease terms to the extent those terms overlap with the blended-royalty scheme.  *See* Certification Order (Doc. 45) at 9.  The Arkansas Court of Appeals' decision did not address that question, so there is no good reason to revisit that ruling.

Arkansas Supreme Court's refusal to take the case on further appeal.[22]  For practical purposes, the Arkansas Court of Appeals' decision stands as the law of the land—at least for the Arkansas state court system. [23]  All trial courts in Arkansas are bound by it.[24]  Principles of comity and federalism, as well as the desire to avoid forum shopping, counsel (if not require) this Court to take a fresh look at its original *Erie* guess in light of the Arkansas Court of Appeals' decision.  But first it is necessary to understand the gravity of a state intermediate appellate court decision in the *Erie* universe.

### III.    State Intermediate Appellate Court Decisions Under the *Erie* Doctrine

As explained above, when a federal court sits in diversity, it must apply the substantive law of the forum state.[25]  This Court is thus duty-bound to follow the decisions of the Arkansas Supreme Court.[26]  That's the basic holding of *Erie*.[27]  And no one questions that rule here.

---

[22] Careful readers will, by this point, understand that the Arkansas Supreme Court first denied this Court's Certification Order—which explicitly stated how this Court would rule on the "net proceeds" issue in the event of such a denial—and then, just months later, denied an appeal of a state court decision that decided the same exact statutory-interpretation question in a completely different way than this Court had decided it.  Why the Arkansas Supreme Court has declined multiple opportunities to intervene in one (or both) of these cases and resolve the potential federal-state conflict bubbling up here is unclear.  Although it is well above this Court's pay grade, the Court suggests that, if this case is appealed, the Eighth Circuit seriously consider affording the Arkansas Supreme Court one last opportunity to weigh in by way of certification.

[23] The Arkansas Court of Appeals can overrule itself.  *See, e.g.*, *Elliott v. Boone Cnty. Indep. Living, Inc.*, 56 Ark. App. 113, 116, 939 S.W.2d 844, 846 (1997).  But it appears that this only happens if a six-judge or nine-judge panel convenes and reexamines a ruling made by a prior panel of fewer judges.  *See, e.g, id.* (six-judge panel overruling existing precedent); *Apollo Coating RCS, Inc. v. Brookridge Funding Corp.*, 81 Ark. App. 396, 398, 103 S.W.3d 682, 684 (2003) (six-judge panel overruling precedent from a three-judge panel), *superseded by court rule*, Ark. R. Civ. P. 52; *Baxley v. Baxley*, 92 Ark. App. 247, 254, 212 S.W.3d 8, 13 (2005) (six-judge panel overruling existing precedent).  The Court has found no cases where a three-judge panel overruled precedent from another three-judge panel.

[24] *See* Ark. Sup. Ct. R. 5-2(c) ("Every . . . Court of Appeals opinion issued after July 1, 2009, is precedent and may be relied upon and cited by any party in any proceeding.").

[25] *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1008 (8th Cir. 2023) (citing *Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014)).

[26] *See id.* (citing *Brill ex rel. Brill v. Mid-Century Ins. Co.*, 965 F.3d 656, 659 (8th Cir. 2020)).  *See also West v. Am. Tel. & Tel. Co*, 311 U.S. 223, 237 (1940).

[27] *See* 304 U.S. at 78.

A problem arises under *Erie*, however, where a state's highest court has not spoken directly on an issue that a federal court is asked to resolve in diversity.  In that circumstance, binding Eighth Circuit precedent requires a federal court to "predict how"[28] the state supreme court would rule by "consider[ing] relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."[29]  From this general principle, we can glean that decisions from state intermediate appellate courts do not bind federal courts of their own force, but they can be—and often are—extremely relevant data points in making an educated *Erie* prediction.  All of this raises some tricky questions: (1) exactly how much weight should such decisions be given in the *Erie* analysis; and (2) when, if ever, should such weight be dispositive.

Cases from the United States Supreme Court decided in the aftermath of *Erie* teach that a state intermediate appellate court decision from the forum state is an exceedingly persuasive indicator of state law and is not to be disregarded lightly.[30]  And that is for all the obvious reasons one might guess:

> True, as was intimated in the Erie Railroad case, the highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted.  But the obvious purpose of [section] 34 of the Judiciary Act is to avoid the maintenance within a state of two divergent or conflicting systems of law, one to be applied in the state courts, the other to be availed of in the federal courts, only in case of diversity of citizenship.  That object would be thwarted if the federal courts were free to choose their own rules of decision whenever the highest court of the state has not spoken.

---

[28] *Brill ex rel. Brill*, 965 F.3d at 659 (citing *C.S. McCrossan, Inc. v. FDIC*, 932 F.3d 1142, 1145 (8th Cir. 2019)).

[29] *Gilstrap v. Amtrak*, 998 F.2d 559, 560 (8th Cir. 1993) (quoting *Kifer v. Liberty Mut. Ins. Co.*, 777 F.2d 1325, 1329–30 (8th Cir. 1985)).

[30] *See West*, 311 U.S. at 237; *Six Cos. of Cal. v. Joint Highway Dist.*, 311 U.S. 180, 188 (1940); *Fidelity Union Tr. Co. v. Field*, 311 U.S. 169, 179–80 (1940).

> A state is not without law save as its highest court has declared it.  There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them.  In those circumstances a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court, even though it thinks the rule is unsound in principle or that another is preferable.  State law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts.

> Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.  This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.[31]

Notwithstanding the tenor of these cases, however, *exceedingly persuasive* is not the same thing as *binding*.  The Supreme Court has never held outright that a state intermediate appellate court decision is a definitive statement of state law for purposes of an *Erie* analysis.  Nor has the Eighth Circuit.

To be sure, a federal court cannot disregard a decision of a state's intermediate appellate court simply because the federal court would have decided the issue differently.  The federal court is not free to rewrite state law.  And when there is no ruling from a state's highest court, the decision of that state's intermediate appellate court is often the next-best indication of what a state's law is.[32]  In such circumstances, the state intermediate appellate court decision must be

---

[31] *West*, 311 U.S. at 236–37 (internal citations omitted).

[32] *See, e.g.*, *Washington v. Countrywide Home Loans, Inc.*, 655 F.3d 869, 873 (8th Cir. 2011) ("The Missouri Supreme Court allowed the [state intermediate appellate court decision] to stand as authority by denying transfer of the case from the court of appeals.  The [decision] is, thus, the best evidence of Missouri law.").

followed.  As the Eighth Circuit puts it, a federal court must follow state intermediate court decisions "when they are the best evidence" of how the state's highest court would rule. [33]

But the Eighth Circuit has taken pains to make clear that state intermediate appellate court decisions are not always the best evidence of how a state's highest court would rule.  And the Eighth Circuit has not shied away from disregarding a state intermediate appellate court's decision in the face of other more persuasive data points.[34]  The Eighth Circuit has, in past cases, relied on a wide variety of reasons to conclude that a state intermediate appellate court decision was not the best evidence of what a state's supreme court would do.  These reasons include, but are not limited to, poor or faulty statutory analysis in the state intermediate court decision,[35] conflicts between the state intermediate court decision and considered dicta from state supreme court caselaw,[36] and even more amorphous indicia like sound public policy.[37]  When a state intermediate appellate court's decision is not the best evidence of how the state supreme court would rule, the decision does not bind federal courts and is treated as one data point among many that "may provide *some* evidence" of what state law is.[38]

---

[33] *B.B. v. Cont'l Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir. 1993) (citing *Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 712–13 (8th Cir. 1992)).

[34] *See, e.g.*, *Rashaw v. United Consumers Credit Union*, 685 F.3d 739, 742–44 (8th Cir. 2012) (declining to follow a state intermediate appellate court decision because it contradicted much earlier state supreme court caselaw and engaged in faulty statutory interpretation); *Gage v. HSM Elect. Protection Servs. Inc.*, 655 F.3d 821, 826–28 (8th Cir. 2011) (declining to follow more recent state intermediate appellate court decisions because they conflicted with much earlier state supreme court precedent); *Bogan v. Gen. Motors Corp.*, 500 F.3d 828, 830–32 (8th Cir. 2007) (declining to follow "a number of [state] appellate court decisions" that directly conflicted with dicta from a footnote in a state supreme court case); *B.B.*, 8 F.3d at 1294–95 (declining to follow a state intermediate appellate court decision because, *inter alia*, its relevant statements were dicta, it was partially contradicted by another state intermediate appellate court decision, and following it would be contrary to state public policy).

[35] *See Rashaw*, 685 F.3d at 742–44.

[36] *See Bogan*, 500 F.3d at 830–32.

[37] *See B.B.*, 8 F.3d at 1295.

[38] *I Square Mgmt., LLC v. McGriff Ins. Servs., Inc.*, 52 F.4th 1028, 1031 (8th Cir. 2022) (emphasis added).

## IV.      Does the Arkansas Court of Appeals' Decision Alter the Court's *Erie* Prediction?

The case that ultimately became *Flywheel Energy Production, LLC v. Arkansas Oil and Gas Commission* began as an administrative action before, unsurprisingly, the Arkansas Oil and Gas Commission (AOGC).[39]  After receiving complaints from royalty owners, the AOGC opened an investigation into Flywheel's deduction practices, conducted a hearing concerning those practices, and determined that Flywheel's deductions (the same deductions that are at issue here in federal court) were improper.[40]  Specifically, the AOGC concluded that the term "net proceeds" was undefined by Arkansas Code Annotated section 15-72-305(a)(3) and, therefore, ambiguous.[41] The AOGC went on to find that, in its course-of-dealing experience under the statute (through, *inter alia*, force-pooled model leases), there was a historic understanding among landowners, working interest owners, and regulators that royalty deductions were permitted only for taxes, assessments, and true third-party expenses.[42]  Putting those two propositions together, the AOGC thus concluded that the "net proceeds" language in the statute should be interpreted to prohibit deductions of post-production expenses beyond taxes, assessments, and true third-party expenses.[43]

After the Pulaski County Circuit Court agreed with the AOGC, the case was appealed to the Arkansas Court of Appeals.[44]  The Arkansas Court of Appeals held that the term "net proceeds"

---

[39] 2023 Ark. App. 483, at 2, 678 S.W.3d at 853.

[40] *Id.* at 3–7, 678 S.W.3d at 854–56.

[41] *Id.* at 7, 678 S.W.3d at 856.

[42] *Id.*

[43] *Id.*  In the case before the Arkansas Court of Appeals, like the case at bar, everyone appeared to agree that Flywheel had been deducting post-production expenses beyond those three categories.  *See id.* at 3–4, 678 S.W.3d at 854; Joint Stipulation of Facts (Doc. 28) ¶ 10.

[44] *Flywheel*, 2023 Ark. App. 483, at 8–11, 678 S.W.3d at 856–57.  The standard of review in such appeals is *de novo*. *See Rahman v. BF Acquisitions, LLC*, 2022 Ark. App. 465, at 4, 655 S.W.3d 732, 735.  *See also Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 5, 597 S.W.3d 613, 617 (holding that the standard of review when an Arkansas state court reviews an agency interpretation of a statute is *de novo*).

in section 15-72-305(a)(3) is ambiguous.[45]  It is unclear, however, what the Arkansas Court of Appeals did next.  On one read of the opinion, the Arkansas Court of Appeals deferred to the AOGC's interpretation of the term "net proceeds" because it found that interpretation to be one of several reasonable interpretations.[46]  On a different read of the opinion, the Arkansas Court of Appeals itself resolved the purported statutory ambiguity by deciding that the AOGC's decision was the most probative evidence of what "net proceeds" means in the context of the statute.[47]  No matter which way one reads the opinion, however, there are strong reasons to think that it is not the best evidence of how the Arkansas Supreme Court would resolve the "net proceeds" issue.

### A. The Arkansas Court of Appeals' Decision is Not the Best Evidence for an Erie Guess

First, if the Arkansas Court of Appeals was deferring to the AOGC's reasonable interpretation of an ambiguous statute, that would be a direct affront to *Myers v. Yamato Kogyo Co., Ltd.*[48]  In *Myers*, the Arkansas Supreme Court explained that, "[b]y giving deference to agencies' interpretations of statutes, the court effectively transfers the job of interpreting the law from the judiciary to the executive."[49]  The Arkansas Supreme Court thus held that Arkansas state courts may not defer to agencies on questions of statutory interpretation.[50]  Therefore, to the extent that the Arkansas Court of Appeals' decision engaged in such deference, it would not be the best evidence of how the Arkansas Supreme Court would resolve the "net proceeds" question.

---

[45] *Flywheel*, 2023 Ark. App. 483, at 15, 678 S.W.3d at 860.

[46] *See id.* at 19–23, 678 S.W.3d at 862–64.  The Court is using the phrase "deferred to" here to signify a formal *Chevron*-like deference.

[47] *See id.* at 13–20, 678 S.W.3d at 859–62.

[48] *See* 2020 Ark. 136, at 5, 597 S.W.3d at 617.

[49] *Id.*

[50] *Id.*

Second, even if the Arkansas Court of Appeals was not, strictly speaking, deferring to the AOGC's interpretation, there's still reason to believe that the Arkansas Court of Appeals placed too much weight on the AOGC's interpretation and too little weight on other tools of statutory construction.  In so doing, it contravened the spirit if not the letter of *Myers*.  There is little practical distinction between (1) deferring to an agency interpretation and (2) giving that interpretation outsized attention among all the potential statutory interpretation tools.  Such prime billing is not consistent with *Myers*'s teaching that an agency's interpretation of a statute is but "one of . . . many tools used to provide guidance" for judicial interpretation of that statute.[51]  In the extreme (which we are close to here), giving the agency's interpretation such heavy weight risks undermining the *de novo* review mandated by the Arkansas Supreme Court.[52]  It's thus very unlikely that the Arkansas Supreme Court would give the same weight to the AOGC interpretation that the Arkansas Court of Appeals did.  Correspondingly, it's hard to imagine the Arkansas Court of

---

[51] *Id.*

[52] The Arkansas Court of Appeals frankly acknowledged that it found it "compelling that the AOGC and operators in the Fayetteville Shale Play, including Flywheel's predecessor in interest," all "continuously" interpreted section 15-72-305 to prevent working interest owners from deducting post-production expenses.  *Flywheel*, 2023 Ark. App. 483, at 20, 678 S.W.3d at 862.  It emphasized that the AOGC claimed "there was a long-standing practice under the statute that certain postproduction expenses were not deducted from the royalties . . . ."  *Id.* at 8, 678 S.W.3d at 856. It noted that, in the underlying agency hearings, AOGC commissioners "discussed the factual history underlying both the creation of Ark. Code Ann. § 15-72-305 and the AOGC's model leases."  *Id.* at 22, 678 S.W.3d at 863.  And it noted the commissioners' view that, "when the model leases and section [] 15-72-305 were drafted, 'net proceeds' was not intended to include postproduction expenses."  *Id.  See also* Ex. 3 (Comm'n Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 37–39.  Putting aside the risks inherent with substituting personal memories of decades-past AOGC meetings for the actual text of a statute, there are other problems with overreliance on agency views.  For example, in this case, it appears some of the commissioners' reticence to adopt Flywheel's interpretation of "net proceeds" primarily focused on the purportedly disruptive impact such a change in deduction practices would have. *See* Ex. 3 (Comm'n Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 51–53.  That's a fair and important concern for an AOGC commissioner.  But it cannot be a primary concern for a court of law that takes textualism seriously.  Indeed, one of the commissioners was very clear as to what he was doing: "I think that the interpretation that we've been using is the correct interpretation from an oil and gas commission, and I'm not stepping off into legal this/legal that, whether we have it right or whether we don't have it right, I'll leave that for someone else to decide." *Id.* at 51.  In short, the Arkansas Court of Appeals' heavy reliance on the AOGC's interpretation is not in keeping with Arkansas Supreme Court precedent.

Appeals' decision being the best evidence of how the Arkansas Supreme Court would resolve the "net proceeds" question.

Third, the Arkansas Court of Appeals' decision failed to give any weight to the "mouth of the well" language in Arkansas Code Annotated section 15-72-305(a)(3)(B)(i).  This is particularly problematic in light of the preeminent interpretive role that the Arkansas Supreme Court has assigned to a statute's text and the linguistic canons of statutory construction (including the whole-text canon).[53]  This Court's Certification Order briefly explained why the "mouth of the well" language must be used to interpret the term "net proceeds."[54]  But because the Arkansas Court of Appeals concluded otherwise, it is worth providing a little more detail here.

Section 15-72-305(a)(3)(B)(i) provides that:

> [E]ach working interest owner or marketing party who has sold gas shall remit or cause to be remitted to the operator one-eighth (1/8) of the revenue realized or royalty moneys from gas sales computed at the mouth of the well, less all lawful deductions, including, but not limited to, all federal and state taxes levied upon the production or proceeds . . . .

The Arkansas Court of Appeals appears to have decided that this subsection was irrelevant because it governs what the working interest owner remits to the operator, whereas the "net proceeds"

---

[53] The Arkansas Supreme Court often says that its ultimate goal in statutory interpretation is to "give effect to the intent of the General Assembly." *Turnbough v. Mammoth Spring Sch. Dist. No. 2*, 349 Ark. 341, 346, 78 S.W.3d 89, 92 (2002).  But that general statement of law is a bit misleading.  Over and over again, the Arkansas Supreme Court has made clear that the principal consideration in statutory analysis is the text itself.  As that court puts it, the first step in determining legislative intent is construing the statute "just as it reads, giving the words their ordinary and usually accepted meaning in common language . . . so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible."  *Id.* (citation omitted).  This textual analysis includes application of the linguistic (i.e., non-substantive) canons.  *See, e.g.*, *Myers*, 2020 Ark. 135, at 7–10, 597 S.W.3d at 618–19 (using semantic and syntactic canons); *Pritchett v. City of Hot Springs*, 2017 Ark. 95, at 6, 514 S.W.3d 447, 451 (using semantic canons).  It is only if the statute's meaning is still unclear after this textualist analysis that the Arkansas Supreme Court turns to more purposivist considerations like "the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject." *MacSteel Div. of Quanex v. Ark. Okla. Gas Corp.*, 363 Ark. 22, 30, 210 S.W.3d 878, 882–83 (2005).  Consideration of what an agency thinks a statute means would, at best, constitute one of these "other appropriate means."  Point being, the Arkansas Supreme Court would certainly not place greater emphasis on an agency's interpretation of a statute than it would place on the actual language of the statutory scheme being examined.

[54] Certification Order (Doc. 45) at 17–18.

subsection governs what the operator remits to the landowner.[55]   But the fact that the two subsections govern different relationships is of no moment because the relationships are intertwined and dependent on each other.

The operator is the middleman between the working interest owner and the landowner.  In addition to the operator's responsibility for extracting the gas, section 15-72-305 charges the operator with the duty to collect and distribute royalty funds—essentially a bookkeeping function for the benefit of working interest owners and landowners.[56]  If section 15-72-305(a)(3)(B)(i) were interpreted to allow working interest owners to deduct more post-production expenses from the payments they remit to the operator than the operator could deduct from the payments that it distributes to the landowners, the operator would have to dip into its own pocket to pay the landowners for the post-production expenses withheld by the working interest owners.  Put another way, interpreting the "net proceeds" language in section 15-72-305(a)(3) to allow fewer deductions than those allowed by the "mouth of the well" language in section 15-72-305(a)(3)(B)(i) would result in post-production costs being borne by the operator—essentially a neutral, nonparty bookkeeper—rather than either party to the relevant mineral-rights lease.  This would be, in a word, absurd.[57]

---

[55] *Flywheel*, 2023 Ark. App. 483, at 14, 678 S.W.3d at 859.

[56] *See* Certification Order (Doc. 45) at 4–6, 11–13.  Since the operator is the only entity with all of the necessary information from all of the landowners and all of the working interest owners, it is the only entity capable of distributing the blended royalty funds.  The operator has all the relevant information (including tax information and the precise interest fractions) about all integrated landowners in the unit.  *See* Ark. Code Ann. § 15-72-305(a)(1)(A)(i). Each non-operator working interest owner, however, only has such information about the landowners with which it has mineral-rights leases.  Without the operator, each working interest owner would have to collect and maintain information on all integrated landowners (even ones it does not have any contractual relationship with), calculate the precise blended royalty payment owed to each individual landowner, and distribute those payments.  The landowners, on the other hand, would be receiving their blended royalty payments in piecemeal fashion from different working interest owners, with each piecemeal payment a potential source of error or dispute.  Such a system would be almost unworkable and, at a minimum, illogical.

[57] The Arkansas Supreme Court "will not give statutes a literal interpretation if it leads to absurd consequences that are contrary to legislative intent."  *Turnbough*, 349 Ark. at 346, 78 S.W.3d at 92.

"[C]omputed at the mouth of the well" must therefore be read as providing a floor for what can be deducted under the "net proceeds" language.[58]  But the Arkansas Court of Appeals' decision did not grapple with the "mouth of the well" language and how that language informs the interpretation of "net proceeds."[59]  So the decision is unlikely to be the best evidence of how the Arkansas Supreme Court would approach the "net proceeds" interpretive question.

Fourth, and finally, the Arkansas Court of Appeals' decision that the "net proceeds" language does not allow the type of deductions Flywheel took is in tension with what at least counts as considered dicta from *Hanna Oil and Gas Co. v. Taylor*.[60]  In *Hanna*, which addressed language in an oil-and-gas lease (as opposed to language in a statute), the Arkansas Supreme Court analyzed whether a working interest owner was entitled to deduct compression costs from a royalty payment where the lease stated: "Lessee shall pay Lessor one-eighth of the proceeds received by Lessee at the well for all gas . . . produced from the leased premises and sold by Lessee."[61]  The Court concluded that the working interest owner could not deduct compression costs in part because the lease used the term "proceeds" instead of "net proceeds."[62]  The Arkansas Supreme Court explained that, "[i]f it had been [the parties'] intention to" allow this deduction, "they would

---

[58] The very structure of section 15-72-305(a)(3) suggests the interrelationship between the two terms.  "Net proceeds" appears in the general portion of this subsection.  There are then two further divisions of this subsection.  The "mouth of the well" language appears in one of those further divisions.  It is not surprising that terms in these more specific divisions would be helpful in defining terms in the more general subsection.  After all, if there was no relationship between the requirements of section 15-72-305(a)(3)(B)(i) and section 15-72-305(a)(3), why would one be a division of the other?

[59] In deciding to disregard section 15-72-305(a)(3)(B)(i), the Arkansas Court of Appeals also noted that the subsection "does not identify any 'lawful deductions' other than state and federal taxes."  *Flywheel*, 2023 Ark. App. 483, at 14, 678 S.W.3d at 859.  The Arkansas Court of Appeals' point, it seems, is that the "all lawful deductions" language would not help in determining whether "net proceeds" allows for the deduction of only taxes, assessments, and transportation costs, or instead also allows for the deduction of additional post-production costs.  But that completely ignores the "mouth of the well" language in section 15-72-305(a)(3)(B)(i).

[60] 297 Ark. 80, 759 S.W.2d 563 (1988).

[61] *Id*. at 81, 759 S.W.2d at 564.

[62] *Id.* at 81, 759 S.W.2d at 564–65.

have made some reference to costs, or 'net' proceeds."[63]  Although far from definitive, this passage suggests that the Arkansas Supreme Court believes that, in the oil-and-gas context, the use of the term "net proceeds" expresses an intent to permit deductions for post-production expenses like compression.  And there is no readily apparent reason to think that the Arkansas Supreme Court would treat the "net proceeds" language differently just because it appeared in the context of a statutory royalty rather than the terms of a lease.[64]

For all the foregoing reasons, the Court believes the Arkansas Court of Appeals' decision is not the best evidence of how the Arkansas Supreme Court would interpret the term "net proceeds."  But, of course, that begs an important question: What *is* the best evidence?

### B.  The Best Evidence in the Present Case for an **Erie** *Guess*

In a nutshell, the best evidence of how the Arkansas Supreme Court would interpret the term "net proceeds" is the caselaw and scholarly articles cited in the Court's Certification Order.[65]  But here, again, because the Arkansas Court of Appeals reached an opposite conclusion, it is worth elaborating to some extent.

---

[63] *Id.* at 81, 759 S.W.2d at 565.

[64] *Hanna* is a rather delphic opinion.  And so, on its own, the tension between the Arkansas Court of Appeals' decision and the dicta in *Hanna* would not be particularly noteworthy or concerning.  But it becomes more troubling when viewed together with the other serious divergences between the Arkansas Court of Appeals' interpretation of the "net proceeds" statute and the usual way in which the Arkansas Supreme Court approaches statutory interpretation.

[65] The Court acknowledges that, in its Certification Order, it explained that "there is no Arkansas Supreme Court case that definitively answers these questions, or even one that gives me a good basis to make an educated guess as to how [the Arkansas Supreme Court] would resolve the matter."  Certification Order (Doc. 45) at 8.  It is appropriate to make two observations with respect to the Court's prior statement.  First, that the prior Arkansas Supreme Court cases do not provide a "good" basis for an *Erie* guess is a different matter from whether the state intermediate appellate court decision provides a *better* basis for such a guess.  Here, the state intermediate appellate court decision is so fundamentally inconsistent with how the Arkansas Supreme Court would approach the interpretive process that it would be an even worse basis for an *Erie* guess than the relevant Arkansas Supreme Court cases.  Second, in taking another look at the overall issue presented, the Court now believes the Arkansas Supreme Court's decision in *Parnell, Inc. v. Giller*, 237 Ark. 267, 372 S.W.2d 627 (1963), should be given more weight than the Court originally gave it. *See* Certification Order (Doc. 45) at 18.  There's still not a great indicator of what the Arkansas Supreme Court would do.  But there are indicators that, collectively, suffice to make an educated *Erie* guess.

Recall that the "net proceeds" language in Arkansas Code Annotated section 15-72-305(a)(3) must be interpreted in concert with language from section 15-72-305(a)(3)(B)(i) that references "royalty moneys from gas sales computed at the mouth of the well . . . ." The phrase "at the mouth of the well" carries a specific trade usage in the oil-and-gas industry. It is essentially a shorthand for gas's value in its raw, unprocessed state.[66] Why is that important?

The market for natural gas is frequently located a considerable distance from the producing well, requiring compression, treatment, and other processing in order to actually bring the gas to market. These costs can be substantial. They can also vary considerably over the life of the royalty agreement, especially where an integrated drilling unit extracts both "sweet" (requiring very little processing) and "sour" (requiring more extensive treatment) gas.[67] When a statute or a lease provides that the value of the extracted gas is to be calculated in its raw, unprocessed state, many courts have found that this necessarily requires a landowner to share the burden of post-production costs like transportation, compression, processing, and treatment. This means a working interest owner can deduct those expenses from its gross proceeds before calculating a royalty payment.

Specifically, the Eighth and Fifth Circuits, as well as Texas, Louisiana, and California, have allowed the deduction of a broad range of post-production costs when calculating the value of the gas "at the well."[68] These jurisdictions basically follow what is known as the *Piney Woods*

---

[66] *See* Randy Sutton, Annotation, *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs,* 99 A.L.R. 5th 415 (2002). *See also* Susan Webber Wright, *The Arkansas Law of Oil and Gas: Chapter IV*, 10 U. Ark. Little Rock L. Rev. 5, 12–13 (1987).

[67] *See, e.g.*, *Atl. Richfield Co. v. California*, 262 Cal. Rptr. 683, 686–87 (Cal. Ct. App. 1989).

[68] *See Sondrol v. Placid Oil Co.*, 23 F.3d 1341, 1345 (8th Cir. 1994) (allowing reduction for processing costs when royalty calculated according to the value of the gas at the well); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 231 (5th Cir. 1984) (allowing deduction of processing and transportation costs when calculating the market value of gas "at the well"); *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136 (Tex. 1996) ("[V]alue at the well means the value of the gas before it has been compressed and before other value is added in preparing and transporting the gas to market."); *Merritt v. Sw. Elec. Power Co.*, 499 So. 2d 210, 213 (La. Ct. App. 1986) ("[M]arket value is reconstructed by beginning with the gross proceeds from the sale of the gas and deducting therefrom any additional costs of taking the gas from the wellhead (the point of production) to the point of sale."); *Atl. Richfield Co.*, 262 Cal.

approach.  In *Piney Woods*, the Fifth Circuit examined the costs able to be deducted under various leases where royalties were either based on the actual proceeds of gas "sold at the well" or based on the "market value at the well."[69]  Although the case was governed by Mississippi law, the Fifth Circuit turned not to Mississippi law in interpreting "at the well," but to scholarly work from oil-and-gas law experts.[70]  Relying on these scholars, *Piney Woods* concluded that "at the well" describes "not only [the] location" of the sale, "but [also the] *quality*" of the gas.[71]  Landowners are fairly compensated when they receive their share of the value of the gas in its immediate, unprocessed state.  If they were to be compensated for the extra value that operators and working interest owners create by processing and transporting the gas in order to sell it, that would be a windfall.  So such costs may be deducted from the sale price when calculating royalty payments.[72]

It is notable that *Piney Woods* did not cite Mississippi law for any of the foregoing propositions.  Instead, the Fifth Circuit relied on general, background principles of oil-and-gas law to interpret "mouth of the well" language.  And the Fifth Circuit is not the only federal circuit court to take this approach.  For example, consider *Sondrol v. Placid Oil Co.*, where the Eighth Circuit cited extensively to *Piney Woods*.[73]  *Sondrol* was a case arising under North Dakota law, involving a mineral lease whereby the working interest owner paid the landowner "1/6 of the proceeds received for gas sold from each well where gas only is found, or the market value at the well of

---

Rptr. at 688 (price at the well is calculated by "deducting the cost of processing and transportation to the wellhead" from the price at the point of sale).

[69] *Piney Woods*, 726 F.2d at 230.

[70] *Id.* at 231.  Those commentators suggested that, although it is sensible to calculate a royalty from the actual sale price when a downstream purchaser bears all the expenses of connecting his lines to the well and moving the gas from the well to the industrial consumer, it makes less sense to calculate royalties based on the actual sale price when the extracting party has taken actions beyond the wellhead which increase the value of the gas when sold.

[71] *Id.* (emphasis added).

[72] *Id*.

[73] 23 F.3d at 1345.

such gas used off the premises . . . ."[74]  After finding a North Dakota Supreme Court case inapposite, the Eighth Circuit concluded that the lease's "at the well" language meant that processing fees should be deducted from the sale price before calculating the royalty payment.[75] Quoting *Piney Woods*, the Eighth Circuit explained that, "unless the royalties are reduced by [the working interest owner's] processing expenses, they would be based upon the value of the *processed* gas, contrary to the royalty's purpose of 'compensat[ing] the lessor for the value of the gas at the well.'"[76]

The Eighth Circuit's reliance on *Piney Woods*'s exposition of general oil-and-gas law principles gleaned from secondary sources suggests that, unless there are reasons to believe that a state supreme court has defined or will define "mouth of the well" language in some other way, courts in the Eighth Circuit should hew to the *Piney Woods* (and *Sondrol*) interpretation of "mouth of the well" language.  Whether or not the Eighth Circuit's approach in a case interpreting North Dakota law binds this Court in the instant Arkansas-law case, this Court finds the approach taken persuasive enough to follow.  Here's the upshot of that.  Unless there are reasons to believe that the Arkansas Supreme Court has defined or will define the "mouth of the well" language in some other way, that language should be understood as an industry term that allows for deductions of post-production expenses prior to calculating royalty payments.  This, in turn, would mean that the "net proceeds" language in Arkansas Code Annotated section 15-72-305(a)(3)—which, as discussed previously, must be interpreted consistent with the "mouth of the well" language in section 15-72-305(a)(3)(B)(i)—allows for deductions of post-production expenses prior to calculating royalty payments.

---

[74] *Id.* at 1343.

[75] *Id.* at 1345.

[76] *Id*. (quoting *Piney Woods*, 726 F.2d at 231).

So, are there reasons to believe the Arkansas Supreme Court's interpretation of "mouth of the well" language would diverge from the interpretation in *Piney Woods* and *Sondrol*?  There's one reason, but (as explained below) it is not a sufficiently persuasive reason.

In contrast to the *Piney Woods* approach, the Supreme Courts of Kansas and Oklahoma have held that operators and working interest owners have a duty to convert gas to a merchantable form and, as a consequence of that duty, they can deduct only transportation costs—not processing costs (e.g., compression and gathering)—when computing the value of the gas "at the well."[77]

Relying on its own set of oil-and-gas treatises, as well as industry testimony, the Kansas Supreme Court has held that a working interest owner has an implied duty to market the discovered gas, that this duty "necessarily" includes "prepar[ing] it for market, if it is unmerchantable in its natural form," and that therefore "the [working interest owner] is required to bear" expenses required for the "preparation necessary to make the gas marketable."[78]  Because (under this rule) the working interest owner is supposed to bear the expense of rendering the gas merchantable, the Kansas Supreme Court has held that post-production costs like compression cannot be deducted from the final sale price before calculating the royalty.[79]  At the same time, however, the Kansas Supreme Court has concluded that, once the gas is merchantable, the duty has been satisfied.[80]  So

---

[77] *See Fawcett v. Oil Producers, Inc. of Kansas*, 352 P.3d 1032, 1040 (Kan. 2015); *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882 (Okla. 1992).

[78] *Gilmore v. Superior Oil Co.*, 388 P.2d 602, 606–07 (Kan. 1964) (citing two oil-and-gas treatises).  *See also Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 795 (Kan. 1995) (citing testimony from the American Petroleum Institute to interpret the effect of "at the well" language); *Molter v. Lewis*, 134 P.2d 404, 407 (Kan. 1943) (citing an oil-and-gas treatise for the duty to render gas merchantable).  Kansas and Oklahoma courts variously refer to this corollary to the duty to market as a duty to render the gas "marketable" or "merchantable."  For the sake of clarity, the Court will refer to this corollary duty as the duty to render the gas "merchantable."

[79] *See Sternberger*, 894 P.2d at 799–800.

[80] *Fawcett*, 352 P.3d at 1042.

the costs of transporting that merchantable gas to an actual market should be shared by the landowner and working interest owner.[81]

Oklahoma seems to agree.  In *Wood v. TXO Production Corp.*, the Oklahoma Supreme Court sided with authorities that "believe that marketing expenses should be included as [the working interest owner's] operating costs because, without marketing, there is no production in paying quantities."[82]  That is, because the working interest owner has a duty to the landowner to extract and sell the gas, that duty includes processing the gas if such processing is necessary to sell the gas.  Accordingly, a working interest owner is not entitled to any deductions associated with post-production (including processing) other than transportation costs.[83]

What is most interesting about *Wood*, however, is that it lumps Arkansas in with Kansas and Oklahoma.  *Wood* notes that "Kansas and Arkansas do not allow the [working interest owner] to deduct compression costs, while Louisiana and Texas do."[84]  The case also notes that "Kansas and Arkansas courts have held that the [working interest owner] must bear the cost of installing and operating a compressor where compression was required in order to market the gas."[85]  And the Oklahoma court concludes by "choos[ing] to follow the holdings of the Kansas and Arkansas courts" in "interpret[ing] the [working interest owner's] duty to market to include the cost of preparing the gas for market."[86]

---

[81] *See Sternberger*, 894 P.2d at 796.

[82] 854 P.2d 880, 881–83 (Okla. 1992).

[83] *See id.* at 881.  In its analysis, the *Wood* court contrasted this view with one which believes "the [working interest owner] has fulfilled his duty by obtaining gas capable of producing in paying quantities," i.e., extracting gas from the well that could be sold if it is properly processed at some later point.  *Id.  Wood* attributes the latter view to Louisiana and Texas.  *Id.*  The latter view can also be attributed to the Fifth Circuit and Eighth Circuit as previously discussed.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 882–83.

The Oklahoma Supreme Court is not entirely on its own in its characterization of Arkansas law.  Some scholarly work has also counted Arkansas on the Kansas and Oklahoma side of the split.[87]  And, of course, it is true that, historically, the AOGC has not allowed deductions of post-production costs like compression prior to royalty calculation.  To the extent the Oklahoma caselaw and scholarly articles were simply identifying the on-the-ground facts of how the AOGC was proceeding, they were right.  But to the extent they were characterizing how the Arkansas Supreme Court had ruled or would rule on the deductions question, the accuracy of their characterizations is far from clear.

For example, the Oklahoma Supreme Court's characterization of Arkansas law is based entirely on *Hanna*.[88]  But, as explained in this Court's Certification Order, *Hanna* is not really a "mouth of the well" case.[89]  *Hanna* considered a lease under which the working interest owner was to remit "one-eighth of the proceeds received by [the working interest owner] at the well for all gas . . . ."[90]  The lease was then pooled into a production unit.[91]  During the first eight years of the lease, it was unnecessary to compress the gas in order to deliver it, but compression eventually became necessary.[92]  Still, the working interest owner waited two years before deducting

---

[87] *See, e.g.*, Bruce M. Kramer, *Royalty Interest in the United States: Not Cut from the Same Cloth*, 29 Tulsa L.J. 449, 472 (1994) (grouping Arkansas with Kansas and Oklahoma in denying working interest owners the right to deduct post-production expenses, relying on *Hanna*); Thomas F. Meeks, Note, *Perry v. Nicor Exploration, Inc.: Split Stream Sales and Paying Quantities*, 42 Ark. L. Rev. 155, 162 (1989) (using Oklahoma case law to interpret the legislative intent behind Ark. Code Ann. § 15-72-305).  *See also* Ex. 3 (Comm'n Hr'g Tr.) to Pls.' Mot. for Partial Summ. J. (Doc. 29-3) at 30–31 (speculating that Oklahoma law influenced the drafting of Ark. Code Ann. § 15-72-305).

[88] *See Wood*, 854 P.2d at 881–82.

[89] Certification Order (Doc. 45) at 19–20.

[90] 297 Ark. at 81, 759 S.W.2d at 564.

[91] *Id*.

[92] *Id*.

compression costs.[93]  The landowner then challenged those compression-cost deductions.[94]  The *Hanna* court held that "proceeds" meant "total proceeds," and that the lease therefore unambiguously prevented the working interest owner from deducting compression costs.[95]

The *Hanna* majority did not examine the "at the well" language in the lease.  Instead, *Hanna* mysteriously limited its analysis to the "proceeds" language.  The majority cited a Kentucky case and Webster's New World Dictionary for the proposition that "proceeds" means "total proceeds," and then cited a Texas case for the proposition that the parties' course of performance is an important factor in construing a contract.[96]  Those two propositions (chiefly the latter one) were really what controlled the outcome in *Hanna*.  And neither of those propositions says anything about how the Arkansas Supreme Court would interpret the term "mouth of the well" in Arkansas Code Annotated section 15-72-305(a)(3)(B)(i) or whether Arkansas believes that the duty to market gas implies a duty to render the gas merchantable.[97]

Moreover, the *Hanna* majority did not even cite, much less overrule, prior Arkansas Supreme Court precedent that more directly addresses "mouth of the well" language and thus is more indicative of where Arkansas would fall on the Kansas/Oklahoma vs. *Piney Woods* divide.[98]

---

[93] *Id.*

[94] *Id.*

[95] *Id.* at 81, 759 S.W.2d at 564–65.  In context, it is clear that the term "total proceeds" meant "gross proceeds."

[96] *Id.* at 81–82, 759 S.W.2d at 564–65.

[97] It is true that the dissent in *Hanna* accused the majority of "transpos[ing]" the working interest owner's "implied duty to market . . . into a duty to render the gas more valuable than it actually is."  297 Ark. at 83, 759 S.W.2d at 566 (Hays, J., dissenting).  But "[a] dissenting opinion is generally not the best source of legal advice" about what a majority opinion means.  *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).  The *Hanna* majority did not say it was creating, or recognizing, such a rule.  Moreover, if one interprets the *Hanna* majority to have *sub silentio* suggested the existence of a common-law default duty to render the raw gas merchantable by processing it, one must interpret the *Hanna* majority as simultaneously acknowledging that use of the term "net proceeds" would overcome the default rule.  *See* 297 Ark. at 81, 759 S.W.2d at 565–66 ("If it had been [the parties'] intention to" allow deductions for compression, "they would have made some reference to costs, or to 'net' proceeds.").

[98] In *Hillard v. Stephens*, the Arkansas Supreme Court recognized that working interest owners have a "duty to market the gas."  276 Ark. 545, 550, 637 S.W.2d 581, 583 (1982).  But that doesn't tell us anything; all the jurisdictions

In *Parnell, Inc. v. Giller*, the Arkansas Supreme Court considered a mineral-rights lease for brine, under which the royalty to be paid was "the market value at the well of one-eighth (1/8) of the brine . . . ."[99]   The *Parnell* court recognized that the "lease was evidently patterned after a common form of oil and gas lease," and thus found a previous Arkansas Supreme Court case (*Clear Creek Oil & Gas Co. v. Bushmiaer*) interpreting "at the well" language in a gas lease to be the appropriate precedent to apply in construing the brine lease.[100]

At issue in *Parnell* was whether the working interest owner could deduct pipeline and disposal expenses.[101]   As a transportation cost, the pipeline cost fell squarely within allowable deductions under *Clear Creek*.[102]   But *Parnell* also permitted the deduction of the cost of disposing spent brine once the industrial consumer had extracted the desired bromine.[103]   The court justified allowing both deductions under Arkansas law:

> Both services were demanded by the chemical company as a condition to its willingness to enter into the contract of purchase.  It is not reasonable to suppose that the buyer would have agreed to pay as much as it did for the brine if the performance of these necessary steps had been its own responsibility.[104]

---

discussed in this Order say there is an implied duty to market the gas in some form or fashion.  The critical question is whether this duty is fulfilled by extracting the gas or rather includes an implied duty to process the gas.  *Hillard* did not address that question.

[99] 237 Ark. at 267–68, 372 S.W.2d at 627–28.

[100] *Id*. at 268, 372 S.W.2d at 628. (citing *Clear Creek Oil & Gas Co. v. Bushmiaer*, 165 Ark. 303, 264 S.W. 830 (1924)).  In *Clear Creek*, a landowner and natural gas company entered into a mineral-rights lease where the royalty was to be paid on the basis of "the market price of royalty gas at the well . . . ."  165 Ark. at 304, 264 S.W. at 831. The Arkansas Supreme Court held that this language allowed the working interest owner to deduct transportation and distribution costs.  *Id*. at 307–08, 264 S.W. at 832.  But whether or not additional costs beyond those mentioned are deductible when "at the well" language is present was not addressed by the Arkansas Supreme Court.  Other potential post-production deductions like compression and treatment weren't mentioned, likely because they weren't at issue. The working interest owners didn't even argue for broad post-production deductions; they wanted to calculate royalties in a completely different way, which is too factually removed from the present case to provide much insight.  But the fact that *Parnell* expressly applied *Clear Creek* as the controlling precedent shows that the Arkansas Supreme Court was treating *Parnell* as an application and continuation of its oil-and-gas precedent.

[101] 237 Ark. at 267–68, 372 S.W.2d at 627–28.

[102] *Id*. at 269, 372 S.W.2d at 628.

[103] *Id*.

[104] *Id*.

To put it another way, both the transportation costs and the disposal costs improved the value of the product and were essential in making it merchantable.  *Parnell*'s reading of Arkansas oil-and-gas law appears most consistent with the *Piney Woods* approach.

This conclusion is further supported by the language describing allowable deductions later in *Parnell*.  Permissible deductions are those that are (1) "not general business expenses of the [working interest owner]," (2) "services that are essential to and peculiar to the marketing of the product itself," (3) "services that might equally well have been undertaken by the purchaser," and (4) "services that were considered by the purchaser in its determination of what it was willing to pay for the product."[105]  All four considerations comport squarely with the *Piney Woods* (and *Sondrol*) approach.  The first prevents working interest owners from deducting overhead and general business expenses.  The third prevents working interest owners from deducting production costs, because those costs cannot have been undertaken by the purchaser.  The second and fourth, read together, demonstrate what deductions *are* available to the working interest owner: those which are required to render the product merchantable and which increase the value of the product ultimately sold.  In short, the four considerations that *Parnell* sets out collectively look a lot like a workable definition of deductible post-production costs in a *Piney Woods* world.[106]

Absent the delphic nature of the *Hanna* opinion, it would be clear that *Parnell* placed Arkansas on the *Piney Woods* side of things.  But, although *Hanna* muddies the waters a bit, it does not reroute the river.  Based on *Parnell*, it is more likely than not that the Arkansas Supreme

---

[105] *Id.*

[106] Notably, the dissent in *Parnell* would have interpreted Arkansas oil-and-gas law as explicitly restricting the expenses chargeable against a landowner to transportation and distribution costs—an interpretation that would have put Arkansas squarely in line with Oklahoma and Kansas.  *Id.* at 270–72, 372 S.W.2d at 629–30 (McFaddin, J., dissenting).  The Court certainly does not take the dissent's reading of *Parnell* to be dispositive.  *See Students for Fair Admission*, 600 U.S. at 230.  But the fact that the majority declined to adopt the restrictive position taken by the dissent suggests that the Arkansas Supreme Court reads "at the well" using the *Piney Woods* approach and considers costs other than transportation and distribution expenses to be deductible when such language is present.

Court would follow the *Piney Woods* approach.  That means the Arkansas Supreme Court would construe the "mouth of the well" language in section 15-72-305(a)(3)(B)(i) and, in turn, "net proceeds" in section 15-72-305(a)(3) to allow deduction of post-production expenses before royalty calculations are made.

The fact that *Parnell* allowed for deduction of an edge case like waste disposal suggests that more typical post-production expenses would be deductible in the case at bar.  The costs deducted by Flywheel certainly meet *Parnell*'s four-consideration description of deductible expenses.  The compression, treatment, and gathering costs deducted by Flywheel are not general business expenses like "advertising, salaries, [or] telephone."[107]  Compression, treatment, and gathering are "services that might equally well have been undertaken by the purchaser" because a downstream purchaser could have compressed and treated the gas at the wellhead.  They are "services that are essential to and peculiar to the marketing of the product itself" because they are essential to rendering the gas merchantable.  And they are services that would be "considered by the purchaser in its determination of what it was willing to pay for the product" because they increase the market value of the gas.

In sum, the Court concludes that *Parnell*, the dicta from *Hanna*, and *Sondrol* are (at least collectively) better *Erie*-prediction evidence than the Arkansas Court of Appeals' decision.

### C.  What Does this Mean for Plaintiffs' Reconsideration Motion?

As just noted, the Court does not consider the Arkansas Court of Appeals' decision to be the best evidence of how the Arkansas Supreme Court would rule on the "net proceeds" issue.  But this does not mean the Court can just ignore the decision.  In the Court's view, harmonizing the United States Supreme Court and Eighth Circuit precedents set out in Section III above requires

---

[107] *Parnell*, 237 Ark. at 270, 372 S.W.2d at 629 (McFaddin, J., dissenting).

federal courts to acknowledge that, even where a state intermediate appellate court is not the best evidence of how the state supreme court would rule, it is still some evidence of what state law is. And it must be considered with all the other evidence in a totality-of-the-circumstances-type analysis.

That is for good reason.  On a practical level, where the state supreme court has not definitively spoken, a federal court ruling that diverges from a state intermediate appellate court ruling will inevitably incentivize forum shopping.  That is certainly true here, where the Arkansas Court of Appeals' decision binds all trial courts in Arkansas.  On a more theoretical level, it causes some harm to federalism and comity principles when a federal court refuses to accept as state law a decision from the highest state court to have considered the issue thus far.  That principle has even more force when the state supreme court has affirmatively declined to review the decision.[108]

The take home point here is that, given federalism and comity concerns, when the evidence of the right *Erie* guess stands in equipoise, a federal court should adopt the state intermediate appellate court decision.  Even when the evidence tilts slightly in favor of an *Erie* guess that is contrary to the state intermediate appellate court decision, a federal court should, absent unusual circumstances, still adopt the state intermediate appellate court decision as state law.  It is only appropriate for a federal court to decline to follow a state intermediate appellate court decision when that federal court has sufficient conviction that the state supreme court would rule contrary

---

[108] *See West*, 311 U.S. at 237; *Washington*, 655 F.3d at 873.  This extra potency is somewhat mitigated in the case at bar.  Recall that, in addition to denying an appeal from the Arkansas Court of Appeals, the Arkansas Supreme Court also declined the substantially similar question certified by this Court.  This Court included in its Certification Order a description of how it was planning to rule absent an answer from the Arkansas Supreme Court and an explanation of this Court's reasoning for that proposed ruling.  There are many ways—formally and practically—to read the Arkansas Supreme Court's refusal to get involved in both the federal and state cases.  But, at the very least, it tempers the strength of the usual implication of a state supreme court's denial of appellate review of a state intermediate appellate court decision.

to the state intermediate appellate court decision.[109]   In the case at bar, the Court has the requisite

conviction.[110]   Accordingly, Plaintiffs' Motion to Reconsider (Doc. 70) is DENIED.[111]

### V.        The Constitutional Claims

In Count 3 of their operative Complaint, Plaintiffs assert claims for declaratory judgment

under the Contract Clause of the United States Constitution, the Contract Clause of the Arkansas

Constitution, the Takings Clause of the United States Constitution, and the Takings Clause of the

Arkansas Constitution.[112]   These claims appear to have been Plaintiffs' backup plan in case the

Court disagreed with their frontline argument that Arkansas Code Annotated section 15-72-305

"does not require or allow Flywheel to deduct post-production expenses from gas royalties payable

under the Leases . . . ."[113]   But since the Court has stuck with its initial conclusion that Flywheel's

deductions of post-production expenses—including expenses beyond transportation, assessments,

and taxes—were lawful under section 15-72-305, Plaintiffs' constitutional claims must now be

addressed:

> Plaintiffs seek a declaration that Ark. Code Ann. § 15-72-305 violates the Fifth and
> Fourteenth Amendments to the United States Constitution, and Article 2, Section
> 22 of the Arkansas Constitution, in that it effects a taking of Plaintiffs' property
> without just compensation, and that it violates Article 1, Section 10 of the United
> States Constitution, and Article 2, Section 17 of the Arkansas Constitution, in that
> it impairs the obligation of contracts.[114]

---

[109] While it is impossible to reduce the phrase "sufficient conviction" to a numerical probability, the Court believes a sufficient conviction forms, depending on the case, somewhere around the 65% probability mark.

[110] Moreover, with respect to the chance that the Court's *Erie* guess is wrong, the Court is confident that the Arkansas Supreme Court would approach the case (and particularly the interpretative endeavor) in a vastly different way than the Arkansas Court of Appeals did.

[111] The easiest way to avoid forum-shopping as a result of this Order is—assuming one party appeals—for the Eighth Circuit to certify the relevant question to the Arkansas Supreme Court.  Given the recent developments in this case, there is reason for hope that the Arkansas Supreme Court would respond more positively to a Certification from the Eighth Circuit than it responded to the Certification from this Court.

[112] *See* Second Am. Compl. (Doc. 25) ¶¶ 40–41.

[113] *Id.*

[114] *Id.* ¶ 41.

All four of Plaintiffs' claims share the same fatal flaw: section 15-72-305 was enacted long before any of the relevant leases were entered into.  For that reason, all four of Plaintiffs' claims fail.

The Arkansas Constitution's Contract Clause appears in article 2, section 17 of that document, and is modeled on the Contract Clause of the United States Constitution.[115]  Arkansas courts interpret the Arkansas Constitution's Contract Clause in concert with the federal Constitution's Contract Clause.[116]  Under neither clause can a law passed prior to the formation of a contract be said to impair that contract.[117]

Plaintiffs' operative Complaint indicates that all of the relevant leases were entered into by Plaintiffs and Flywheel's predecessor-in-interest in the 2000s and 2010s.[118]  And it is undisputed that Arkansas Code Annotated section 15-72-305 was passed in 1985.[119]  It is legally impossible— under well-established precedent from both the Arkansas Supreme Court and the United States Supreme Court—that section 15-72-305 could have unconstitutionally impaired any of Plaintiffs' contracts.

Plaintiffs' Takings Clause claims fail for a similar reason.  The relevant portions of the Arkansas Constitution and the United States Constitution use substantially similar language, and the Court sees no reason to treat the claims under the two clauses differently.[120]  Both claims fail for the same reason: it is impossible for a property interest to be "taken" if it never existed.  As stated previously, section 15-72-305 was passed long before Plaintiffs entered into any of the

---

[115] *See* U.S. CONST. art. I, § 10.

[116] *See Mahurin v. Oaklawn Jockey Club*, 299 Ark. 13, 16, 771 S.W.2d 19, 21 (1989).

[117] *Id.* (citing *Munday v. Wisconsin Tr. Co.*, 252 U.S. 449 (1920)).

[118] Second Am. Compl. (Doc. 25) ¶ 7.

[119] *See* Ark. Stat. Ann. § 53-115 (Supp. 1985).

[120] *Compare* U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation"), *with* ARK. CONST. art. II, § 22 ("private property shall not be taken, appropriated or damaged for public use, without just compensation therefor").

relevant leases.[121]  And section 15-72-305 does not give Plaintiffs a right to royalties free of post-production deductions.  Rather, section 15-72-305 entitles entities like Flywheel to make those deductions.  Putting the foregoing propositions together, it is clear that Plaintiffs never had a property right to the money so deducted.  Therefore, the Takings Clause claims in Plaintiffs' operative Complaint fail.

One might think this is the end of the story.  It is not.  The constitutional complaints contained within Plaintiffs' operative Complaint are not exactly the ones Plaintiffs have advanced in their summary judgment briefing.  Plaintiffs now argue that the actions of this Court have violated Plaintiffs' constitutional rights by interpreting section 15-72-305 in a manner unfavorable to Plaintiffs.[122]  Such claims are materially different from the claims advanced in Plaintiffs' operative Complaint.[123]  Plaintiffs are certainly welcome to pursue those claims in the future.  But they can only do so after properly pleading them in a complaint.  They have not done so here.  In any event, even if Plaintiffs could pursue these theories introduced for the first time in their summary judgment briefing, the legal theories that they rely on fly in the face of the overwhelming weight of both precedential and persuasive authority.

It is a well-established principle of the Supreme Court's Contract Clause jurisprudence, dating back to the earliest days of the republic, that judicial action cannot unconstitutionally impair

---

[121] *See* Second Am. Compl. (Doc. 25) ¶ 7; Ark. Stat. Ann. § 53-115 (Supp. 1985).

[122] *See* Pls.' Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 66) at 8–9.

[123] As stated above, Plaintiffs' Complaint requests that the Court issue a declaratory judgment finding either that (1) section 15-72-305 prohibits Flywheel's deductions or (2) section 15-72-305 violates the Takings Clause(s) and Contract Clause(s).  Second Am. Compl. (Doc. 25) ¶¶ 40–41.  It is unclear how either of those forms of relief could remedy the purported constitutional-violation-via-judicial-action that Plaintiffs now allege.  In summary, Plaintiffs are advancing a new set of constitutional claims, alleging that this Court has, through adverse rulings, impaired Plaintiffs' contracts and taken Plaintiffs' property in violation of the Arkansas and United States Constitutions.  But they may not do this by dressing up new grounds for relief as the declaratory judgment claims contained in the operative Complaint.

a contract.[124]   And upon reading the text of the Contract Clause, any layman can immediately understand why that is the case.  "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ."[125]   The text is plain as can be; while the Contract Clause applies to practically every action taken by the legislature (i.e., the body that "pass[es]" laws), it does not reach the actions of the judiciary.[126]   Plaintiffs do not cite anything that persuades this Court to read the Contract Clause any differently.[127]

The Takings Clause claims advanced in Plaintiffs' summary judgment briefing have an easier time passing the smell test.[128]   Still, they rely on law that is, at best, unsettled.  The Supreme Court considered the possibility of a taking-via-judicial-decision in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection.*[129]   There, a four-justice plurality endorsed a theory of judicial takings.[130]   But there are several reasons Plaintiffs cannot rely on the

---

[124] *See Ross v. Oregon*, 227 U.S. 150, 160–62 (1913) (illustrating in great detail the long and consistent history of Supreme Court decisions limiting application of the Contract Clause to legislative action).

[125] U.S. CONST. art. I, § 10.

[126] *See Ross*, 227 U.S. at 161–63.

[127] Plaintiffs' citation to *Glens Falls Ins. Co. v. Irion*, 323 F. Supp. 1164 (D. Mont. 1970), is not persuasive.  *See* Pls.' Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 66) at 8.  It is true that, in *Glens Falls*, a federal district court implied that the United States Supreme Court has suggested that judicial interpretation of a statute can violate the Contract Clause of the Constitution.  323 F. Supp. at 1177.  But that implication of a suggestion was in dicta.  Moreover, in context, it is clear that *Glens Falls* was discussing evolving judicial interpretations of a statute that was enacted *after* the contract was formed.  So it is still the statute, and not the judicial interpretation thereof, that is actually doing the impairing.  That's decisively not what has happened in the case at bar.

Plaintiffs also cite an Eighth Circuit case in which judicial action was held to be state action in a highly specific First Amendment context.  *See* Pls.' Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 66) at 9.  In that case, the First Amendment was successfully raised as a defense to right-of-publicity claims, even though the only potential state action at issue was the judicial enforcement of the private tort claims.  *C.B.C. Distrib. and Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823 (8th Cir. 2007).  *C.B.C.* is neither controlling nor persuasive.  Its holding was driven by two factors not at play in our case: (1) the idiosyncrasies of First Amendment caselaw and (2) the fact that a right-of-publicity tort claim "exists only insofar as the courts enforce" it.  *Id.* at 823.  *C.B.C.* isn't even in the same universe as our case, let alone the same ballpark.  No Supreme Court case, no panel of the Eighth Circuit, and no previous judge in the Eastern District of Arkansas has held that an adverse judicial ruling can violate the Contract Clause.

[128] *See* Pls.' Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 66) at 10–13.

[129] 560 U.S. 702 (2010).

[130] *Id.* at 713–15.

*Stop the Beach* plurality.  First, the other four justices declined to endorse the judicial-takings theory.[131]  As a result, "no 'controlling principle [on the judicial takings issue] can be gleaned' from the plurality and concurring opinions."[132]  Second, the plurality's discussion of judicial takings is ultimately dicta because the Supreme Court unanimously held that, regardless of whether a judicial decision can constitute a taking, the relevant state court decision did not eliminate a property right established under state law.[133]  Finally, in the time since *Stop the Beach* was decided, neither the Supreme Court nor any federal court of appeals has endorsed the judicial-takings theory.[134]  In fact, federal courts of appeals have scrupulously avoided the question of whether judicial action can effect a taking.[135]

Fortunately for this Court, it too can scrupulously avoid the judicial-takings question in the case at bar.  As the Supreme Court recognized in *Stop the Beach*, "[t]he Takings Clause only protects property rights as they are established under state law, not as they might have been established or ought to have been established."[136]  In the case at bar, Arkansas Code Annotated section 15-72-305 was passed long before any of the relevant leases came into existence.[137]  And section 15-72-305 entitles Flywheel to make post-production deductions.  In short, Plaintiffs never had a property right in any funds so deducted.  That is, Plaintiffs had no property right in what they claim was taken.

---

[131] Only eight justices took part in deciding *Stop the Beach*.

[132] *Pavlock v. Holcomb*, 35 F.4th 581, 587 (7th Cir. 2022) (citing *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 615 (7th Cir. 2014)).

[133] *Id.* (citing *Stop the Beach*, 560 U.S. at 733).

[134] *Id. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 276 (2024), comes very close to doing so, but its relevant statements were dicta with respect to judicial takings.

[135] *Pavlock*, 35 F.4th at 587–88.

[136] *Stop the Beach*, 560 U.S. at 732.

[137] *See* Ark. Stat. Ann. § 53-115 (Supp. 1985); Second Am. Compl. (Doc. 25) ¶ 7.

Our case is fairly analogous to *PPW Royalty Trust ex rel. Petrie v. Barton*.[138]  The facts of that case are atrociously complicated and do not merit extended discussion here.[139]  But the bottom line of that case is important.  In the Eighth Circuit, a judicial decision that "[does] not eliminate an established property right, but instead address[es] [an] open question" of pre-existing law cannot be a taking.[140]  Where a judicial decision "merely clarifie[s] and elaborate[s] the rights of the . . . plaintiffs" under pre-existing law, a judicial-takings claim would fail, even if the Eighth Circuit were to adopt the judicial-takings theory from the *Stop the Beach* plurality.[141]

The Court finds *PPW* to be applicable here.  The Court's decision does not eliminate an established property right.  Rather, it addresses the ongoing dispute between Flywheel and the Plaintiffs regarding the open question of what deductions from the blended royalty are authorized by a statute that predates the relevant contracts.  The Court is merely clarifying and elaborating the extent of Plaintiffs' rights under the pre-existing Arkansas blended-royalty statute, an action that could not constitute a judicial taking even if the Court were to embrace the *Stop the Beach* plurality.[142]

In sum, Flywheel is entitled to summary judgment with respect to all of Plaintiffs' constitutional claims.[143]

---

[138] 841 F.3d 746, 756 (8th Cir. 2016).

[139] *See id.* at 748–753.

[140] *Id.* at 756.

[141] *Id.*  This is very similar to language used by the Third Circuit in dismissing a judicial-takings claim without endorsing the judicial-takings theory.  *See In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 425 (3rd Cir. 2013) (holding that a bankruptcy court's order was not a taking because it "did not take any of [the party's] established property rights, but rather adjudicated the parties' bona fide dispute regarding their rights under the Settlement Agreement. This sort of adjudication of disputed and competing claims cannot be a taking.").

[142] *See also Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1215–16 (9th Cir. 2020) (stating that even if the panel were to adopt the judicial-takings theory from the *Stop the Beach* plurality, "[f]or such an argument to succeed, Wells Fargo would have to demonstrate that a contrary interpretation of [the relevant statute] had been established in Nevada law before [the judicial decision argued to have effected the taking]").

[143] To be clear, the Court's analysis of Plaintiffs' constitutional claims covers all forms of these claims—whether based on the Court's interpretation of the "net proceeds" language in section 15-72-305(a)(3) or based on the Court's

## VI.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Reconsideration (Doc. 70) is DENIED, and Flywheel's Motion for Summary Judgment (Doc. 61) is GRANTED.  Judgment will be entered for Flywheel on all claims brought against it, and this case will be CLOSED.

IT IS SO ORDERED this 24th day of October 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

conclusion that the statutory blended royalty effectively replaces Plaintiffs' leasehold royalty for the first 1/8 royalty owed.  The analysis is the same for both purported bases of constitutional claims.